USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-2073 UNITED STATES, Appellee, v. JOSEPH N. CASSIERE, Defendant, Appellant. __________ No. 92-2074 UNITED STATES, Appellee, v. JANET M. PEZZULL0, Defendant, Appellant. __________ No. 92-2182 UNITED STATES, Appellee, v. JANET DOLBER, Defendant, Appellant. _____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Friedman,* Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Robert B. Mann with whom Mann & Mitchell was on brief for ________________ _________________ appellant Joseph Cassiere. John A. MacFadyen for appellant Janet M. Pezzullo. _________________ Kenneth J. Fishman with whom Peter Charles Horstmann, Susan J. ___________________ _______________________ ________ Naughton and Bailey, Fishman & Leonard were on brief for appellant ________ ___________________________ Janet Dolber. Margaret R. Hinkle, Special Assistant United States Attorney, ___________________ with whom A. John Pappalardo, United States Attorney, was on brief for __________________ appellee. ____________________ September 16, 1993 ____________________ _____________________ *Of the Federal Circuit, sitting by designation. Friedman, Senior Circuit Judge. ____________________ In these consolidated appeals the three defendants challenge their convictions of wire fraud and conspiracy to commit that offense on various grounds. The fraud involved an intricate and sophisticated scheme involving a technique known as a "land flip," under which real property is purchased for a low price, immediately resold at a much higher price to a straw or fictitious buyer, and the higher resale price is used as the basis for obtaining a mortgage loan that finances the entire transaction. One of the defendants also challenges her sentence. We affirm. I. A jury in the United States District Court for the District of Massachusetts convicted the defendants Cassiere and Pezzullo of fifteen counts of wire fraud and aiding and abetting wire fraud, and the defendant Dolber of thirteen counts of that crime (it acquitted her on one count), in violation of 18 U.S.C. 1343 (1988), and all three defendants of one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. 371 (1988). The district court sentenced Cassiere to 46 months imprisonment, followed by five years of supervised release, Pezzullo to 24 months imprisonment, followed by three years of supervised release, and Dolber to 39 months imprisonment, followed by three years of supervised release. Each defendant also was ordered to make restitution. -3- 3 The substantive crimes for which the three defendants were convicted involved their participation in a scheme to defraud six mortgage lenders through a series of fifteen land flips, in all but one of which the two sales of the property were closed on the same day, often the second immediately following the first. Cassiere was the senior partner of Pezzullo in a two-person law firm that handled all the closings in the land flip transactions. Dolber was a real estate appraiser, whose appraisals of the properties were relied on by the mortgage lenders in making their loans. Rate Line was a mortgage broker which, for a fee, took loan applications and referred them to lenders. Thomas DeNunzio owned Rate Line, and he and his employee loan broker, Glenn Monteiro, controlled Rate Line. DeNunzio and Monteiro planned and organized the fraudulent scheme, under which one of three straw corporations they controlled (Half & Half, Inc., ZBA Corp. and Chantel, Inc.) purchased foreclosed property for cash and resold the property on the same day to straw buyers at a much higher price. Mortgage loan funds received from the lending institutions were used to pay the corporation controlled by Rate Line and that corporation then paid for the first sale. The balance then went to DeNunzio and Monteiro, channeled through Rate Line. DeNunzio and Monteiro pleaded guilty to another indictment and they both testified for the government in the present case. They described in detail how the scheme operated, -4- 4 the roles Cassiere, Pezzullo, and Dolber played in the scheme, andDeNunzio's andMonteiro's relationshipwith thethree defendants. An example of the operation of the scheme was as follows: On April 12, 1991, Half & Half Corporation closed the purchase of property at 104 Menlo Street for $102,900. Moments later Half & Half closed the sale of the property to Fred Strangis, one of the dummy purchasers, for $228,000. Dolber previously had appraised the property at $228,000. Based on this appraisal and Strangis' certification that he would reside at 104 Menlo Street, Rate Line gave Strangis a mortgage loan of $182,400, which was eighty percent of the final sale price. Rate Line, in turn, sold Strangis' mortgage to CenTrust Mortgage Corporation. Neither Half and Half nor Strangis brought a down payment to the double closing. Instead, Monteiro provided a cashier's check for the twenty percent down payment ($45,600) the lender required the purchaser to make. Cassiere and Pezzullo recorded both deeds and disbursed the funds they had received from the lender. They paid the original owner the $102,900 owed by Half & Half, they paid the closing costs, including attorneys' fees due them, and gave the balance to Monteiro and DeNunzio. Cassiere, assisted by Pezzullo, was the closing attorney in each of the double closings. They represented the interests of the lending institution that was providing, through Rate Line, the mortgage loan to the final buyer. The closing -5- 5 attorney serves as "the eyes and ears" of the lending institution at the closing. The lenders expected the attorneys to alert them to anything unusual. Neither Cassiere nor Pezzullo notified any of the six lenders that their law firm was closing twice on the same property on the same day at substantially different prices. Dolber was the real estate appraiser in thirteen of the flips. The lending institutions relied on her appraisals to determine the value of the properties upon which they were making loans. The appraisal alerts the lenders to the property's condition and allows them to determine their ability to recoup their investment should the borrower default on the mortgage. The lenders generally made loans of the lesser of eighty percent of the sale price or fair market value of the property. The six lenders made mortgage loans totalling more than $2.6 million on the properties that were the subject of the land flips involved in this case. Ten of the thirteen appraisals Dolber made of the properties involved in the land flips were for an amount identical to the final sale price, which ranged from $160,000 to $231,000. (The original sale prices of those properties ranged from $42,000 to $132,000.) Two of the three other appraisals were for $1,000 higher than the second sale price; the third was for $2,000 higher. II. Sufficiency of the Evidence Pezzullo and Dolber, but not Cassiere, challenge the sufficiency of the evidence to support their convictions. -6- 6 In reviewing the record in such a challenge, we "look[] to the evidence as a whole, including reasonable inferences drawn from it, in the light most favorable to the verdict, to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United ______ States v. Plummer, 964 F.2d 1251, 1254 (1st Cir.), cert. denied, __________________ ____________ 113 S. Ct. 350 (1992). "We do not weigh witness credibility, but resolve all credibility issues in favor of the verdict. The evidence may be entirely circumstantial and need not exclude every reasonable hypothesis of innocence; that is, the factfinder may decide among reasonable interpretations of the evidence." United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir. 1991) ________________________________ (citations omitted). Thus viewed, the record supports the convictions. A. The Wire Fraud Convictions __________________________ To prove wire fraud the government must show: 1) a scheme to defraud by means of false pretenses, 2) the defendant's knowing and willful participation in the scheme with the intent to defraud, and 3) the use of interstate wire communications in furtherance of the scheme. United States v. Serrano, 870 F.2d 1, ________________________ 6 (1st Cir. 1989). To support convictions of aiding and abetting wire fraud, the government must prove that the "defendant associated [herself] with the underlying venture, participated in it as something [she] wished to bring about, and sought by [her] actions to make it succeed." United States v. Clifford, 979 F.2d _________________________ -7- 7 896, 899 (1st Cir. 1992) (citing Nye & Nissen v. United States, ______________________________ 336 U.S. 613, 619 (1949)). Neither Pezzullo nor Dolber challenges the existence of a scheme to defraud. The scheme is shown by DeNunzio's and Monteiro's lengthy testimony about the details of their plan to trick the lending institutions into making risky loans that were warranted by neither the final purchaser's ability to repay the loan nor the particular property's true market value. Pezzullo and Dolber also do not challenge the use of interstate wire communications to effectuate the plan, as demonstrated at trial by testimonial and physical evidence of the use of fax machines and telephone conversations throughout the scheme. Pezzullo and Dolber, however, claim that they were unaware of the scheme and therefore were not knowing and willful participants in it. We hold, however, that the jury reasonably could have concluded from the voluminous evidence at trial that both Pezzullo and Dolber knowingly participated in the scheme with intent to defraud, and also aided and abetted the fraud. 1. Pezzullo ________ Pezzullo participated in all the double closings, almost all of which took place at the office of the Cassiere & Pezzullo law firm. Fred Strangis testified that Pezzullo's role was to "prepare all the papers and as you're signing them, would bring them to you, try to get you to read them, try to explain them to you." Frank Andrews and Dennis Griffin, two other straw final buyers, and Marlissa Pina, representing one of the -8- 8 controlled corporate purchasers, corroborated Strangis' testimony. Because the lending institutions give higher mortgages to individuals who live in the property they buy, Strangis signed Residential Loan Applications and Owner Occupancy Affidavits, which Pezzullo gave him, stating that he intended to occupy the property. Strangis was the final purchaser of four properties, however, and at closings on December 12, 1990, February 6, 1991, April 12, 1991, and April 15, 1991, he signed forms stating that four different properties would be his primary residence. Other straw final purchasers similarly signed multiple owner-occupancy documents at the closings: Peter Pina within one month and a half signed three such forms; Jeanette Monteiro within a four-month period twice signed such documents; Dennis Griffin in one month signed two such documents; and Frank Andrews within three months signed two. Pezzullo witnessed the signing of each of these documents. All of the lenders required that the purchaser bring a twenty percent down payment to the closing. Neither the straw buyers making the second purchases nor the corporations making the first purchases brought down payments with them. Instead, Cassiere or Pezzullo notified Monteiro before the closing of the amount of the down payment and he would bring a cashier's check for that amount to the closing. Nonetheless, the HUD-1 Settlement Statements that Cassiere filled out at the closings reported that the buyers had brought the money. -9- 9 The only function of the officers of the corporations that DeNunzio and Monteiro controlled was to sign legal documents designed to keep Monteiro's and DeNunzio's roles hidden. Pezzullo, however, was aware that DeNunzio and Monteiro controlled the corporations, since Half & Half used the Cassiere and Pezzullo offices as its corporate address. At the double closings where each property was first sold and then purchased, neither Cassiere nor Pezzullo told the corporate officers what the documents they were signing meant, or that they were buying and selling real property. Pezzullo handled the distribution of the proceeds from the second half of the flip. The proceeds were "the difference between the loan amount [from the lender] minus the first sale price, minus any closing costs." After Cassiere and Pezzullo had completed the deeds on the two sales following the double closings, Pezzullo disbursed the funds that came from the final purchaser's mortgage. Pezzullo gave Monteiro the amount due to the original owner from the first half of the flip, returned the down payments to Monteiro and DeNunzio, and distributed the remaining proceeds to Monteiro and DeNunzio for them to divide. In addition to distributing the mortgage funds, Pezzullo prepared disbursement sheets noting the funds received and the funds disbursed. Paul Pires, as Half & Half's president, first bought and then sold property in nine of the flips. At each closing, in Pezzullo's presence, he signed a HUD-1 form and a statement -10- 10 certifying that he had received a copy of the HUD-1 form, yet neither Cassiere nor Pezzullo ever gave him that document. George Gundensen, president of CenTrust Corporation, one of the lending institutions, testified that the closing attorney is expected to fill in all blank spaces in loan documents before having the mortgagor sign the documents. Some of the final buyers signed forms at the closing, however, that were completely blank. In fact, Cassiere and Pezzullo discussed in Marlissa Pina's presence that they were asking her to sign a blank document. Had the lending institutions been informed that the same law firm had closed twice on the same property on the same day and with such wide price disparities, they would have either "suspend[ed] the loan for further information or cancell[ed] the loan." Because of the large difference between the two sale prices, the lending institution would have believed that it "would be making a loan on a piece of property, the value for which wouldn't support the amount of the loan being made." The foregoing evidence, together with additional evidence in the record we have not discussed, justified the jury's conclusion that Pezzullo both committed wire fraud and aided and abetted its commission. 2. Dolber ______ Although Dolber never participated in the closings, she had a vital role in making the scheme work. Her appraisal forms, which she submitted to Rate Line, supported the high -11- 11 second sale price and thus resulted in the higher mortgages. The lenders relied heavily on the accuracy of Dolber's appraisals. As noted, every appraisal she submitted on the thirteen land flips for properties was identical to the second sale prices, or, in three instances, slightly higher. DeNunzio testified that he wanted to use Dolber as the appraiser because he knew from talking to her that "she would bring in property values as high as possible," and that she "would use non-arm's length transactions for sales comparisons." By non-arm's length transactions, DeNunzio meant "that the comparable sales used were not a true sale with a wanting borrower and a wanting seller." Instead, the comparable sales she used often were previous flips that Rate Line had established, and, therefore, did not reflect true market value. Suburban Mortgage Company made a review appraisal of one of the properties to evaluate Dolber's appraisal. Dolber had appraised the property at $210,000 and described the neighborhood as "a mixture of similar well maintained income properties and medium well maintained single family homes. . . . The neighborhood is stable at this time and shows that revitalization has been completed and upgraded the area. . . . No adverse market conditions from neighborhood." The review appraiser concluded that the market value of the property as of the date of Dolber's appraisal was $50,000. In response to the question "Is the appraiser's overall description of the neighborhood complete and accurate?," the -12- 12 review appraiser answered "No" and explained that "This area is in the midst of a high crime drug area of the city. There are boarded up buildings, fire damaged units and vacant apartments in buildings. This is the least desirable area in the city within which to live." Monteiro accompanied Dolber in viewing some of the appraised properties. He told her of the proposed sale price for the second half of the flip. Usually, the appraised value was very close to the intended sale price. Dolber "appraised at the value needed, so we [Rate Line] continued to use her." There was ample evidence upon which the jury could conclude that Dolber frequently misstated the conditions of the appraised properties, making them appear more valuable than they were. Thus, in her appraisal of 69 Turner Street, Dolber wrote that the property was in need of "cosmetic and minor roof repair," the bathrooms were "fully functioning," the "[k]itchen cabinets are adequate," "two units are rented at this time," and the third unit "will be occupied by the owner." She rated the property's functional utility as "average." Strangis, who was the final purchaser and was present during Dolber's appraisal, testified that the property was "[b]asically a shell of a house," and it was not occupied at the time of her inspection or any time since. It had a lot of broken windows . . . . The porch was broken off, a couple of the gutters were gone. The inside had had no plumbing. Most of the wiring was gone; whatever was still there was hanging out of the ceiling. . . . [I]f -13- 13 there were any tubs and toilets were left in they were turned upside down. There were no stoves, no cabinets. . . . It was nowhere near liveable. . . . A lot of the places didn't have doors. In her appraisal of 34 Harvard Street, Dolber wrote that "[a]ll three units are rented at this time." Monteiro testified that none of the units was rented at the time of the appraisal. Dolber described the property as having "been maintained in average to good condition," with "all mechanical and electrical services [] fully functioning." Martin Pina, the final purchaser of this property, testified that it was "in very bad condition. There was no plumbing, no pipes, no copper at all in the building, it had been stripped out. The building was being used by drug users. There were syringes on the inside of the building. . . . [T]here was a lot of structural damage on the inside." Although Dolber certified in her appraisal that she "personally inspected the subject property, both inside and out," Monteiro and DeNunzio testified that Dolber never entered the premises during her appraisal, and Dolber admitted as much to DeNunzio. Furthermore, Dolber wrote that the property was divided into three units, but Pires testified that there were six units. Dolber described 11 Lebanon Street as needing "only minor cosmetic repair" and that it "appear[e]d to be in average condition." Monteiro testified that all of the copper pipes were removed from within the house and that both the interior and exterior of the house were in poor condition. Dolber reported -14- 14 that there were no units vacant, but Monteiro testified that the property was unoccupied at the time of appraisal. George Strangis testified that there was "no plumbing in the basement, it had been all ripped out," only one of the three hot water heaters stood upright, and it was not connected, "the other two were laying on their side," "[t]he bathroom ceiling on the first floor . . . had been partially ripped down," and "[t]he heating systems weren't operational." Dolber made similar misstatements regarding the condition and occupancy of other properties she appraised. Although she stated that three units at 18 Winthrop Street were rented at the time, Fred Strangis and Frank Andrews testified that only one of the four units was then rented. Dolber described 23 Temple Street as having "been maintained in average to good condition" with "all mechanical and electrical services [] fully functioning," and reported that "[a]ll three units are rented at this time." Martin Pina, however, testified that at the time of the appraisal the property was boarded up, had no electricity, the plumbing had been "filled with some type of Ethyl glycol or antifreeze to stop the pipes from bursting," there was no water, and nobody lived in the building. Dolber also repeatedly appraised multiple properties for the same purchaser, and each time reported that the particular property would be owner-occupied. Thus, in her appraisals she certified that Fred Strangis would occupy four properties, Griffin would -15- 15 occupy two, Andrews would occupy two, and Peter Pina would occupy three. The appraisal form required the appraiser to compare the subject property with recent sale prices of similar properties in the neighborhood, which are known as "comparable sales." In her appraisals, Dolber relied on data from the publication County Comps, which listed the sale prices for closed ____________ sales, as a source of information about comparable sales. Thus, for example, in her appraisal of 79-81 Keith Street, Dolber used three comparable sales and identified County Comps as her data _____________ source. The County Comps she relied on, however, showed that ____________ each of the properties she used as comparable sales had been sold twice within a short period for vastly different prices. Similarly, in her appraisal of 85 Ford Street, Dolber relied on County Comps for her comparable sales. County Comps showed one ____________ ____________ of those properties as involving two sales on the same day, with the second price more than double the first price. Dolber's actions in connection with her proposed acquisition of 30-32 Water Street showed her awareness of how the fraudulent scheme was operating and her willingness to participate in it. She asked DeNunzio to handle a loan for her on the property and proposed that her nephew, Adam Belanger, and his wife, Karen, serve as straw buyers since Dolber had a bad credit rating. After DeNunzio told Dolber that the Belangers would not qualify for a loan because they did not earn enough -16- 16 money, Dolber told DeNunzio that she would give Karen a job, and asked how much salary Karen needed to earn to qualify for the loan. Dolber sent DeNunzio a verification of employment form for Karen from Whitinsville Water Company, a company Dolber's father owned, which was "blank where the employment numbers should have been filled in on the form." Dolber told DeNunzio to fill in the blanks, but when he told her he could not do that, she undertook to do so. Thereafter, DeNunzio received a completed verification-of-employment form, a W-2 statement, and a pay stub for Karen Belanger. Both Samuel Carpinetti, Whitinsville Water Company's general manager, and Karen Belanger testified that Karen never worked for the company. Dolber argues that the government's proof failed because it did not establish the appraised properties' fair market value. She cites no precedent, however, and we know of none, that requires the government to prove a precise fair market value as an element of the crime of wire fraud. To the contrary, she notes that "market value was not in and of itself an element of the offenses with which Ms. Dolber was charged." Furthermore, the evidence justified a jury conclusion that Dolber's appraisals falsely represented the condition and thereby the value of the properties. Again, citing no case law to support her contention, Dolber argues that "the jury was left to speculate as to what conduct on the part of Ms. Dolber was inappropriate," because the -17- 17 government did not point to any code of professional ethics that governed her behavior. Violation by the defendant of a code of ethics is not an element of the crime of wire fraud. Dolber presented a version of the facts which portrayed her as an innocent victim of DeNunzio's scheme to defraud the lenders. The foregoing evidence, and other evidence we have not discussed, however, provided the jury with an ample base for rejecting Dolber's claim, and concluding that she committed wire fraud and aided and abetted its commission. B. The Conspiracy Convictions __________________________ To prove that a defendant is a member of a conspiracy, the government must demonstrate beyond a reasonable doubt that: 1) the defendant agreed to commit an unlawful act, 2) the defendant voluntarily participated in the scheme, and 3) one of the conspirators took an affirmative step toward achieving the conspiracy's purpose. Braverman v. United States, 317 U.S. 49, ___________________________ 53 (1942); United States v. Gomez-Pabon, 911 F.2d 847, 852 (1st _____________________________ Cir. 1990), cert. denied sub nom. Guzman v. United States, 498 ______________________ ________________________ U.S. 1074 (1991). To prove that a defendant "belonged to and participated in the conspiracy, the government [must] prove that he intended to agree and that he intended to commit the substantive offense." United States v. Nueva, 979 F.2d 880, 884 ______________________ (1st Cir. 1992), cert. denied, 113 S. Ct. 1615 (1993). ____________ "[C]onspiratorial agreement need not be express so long as its existence can plausibly be inferred from the defendants' words and actions and the interdependence of -18- 18 activities and persons involved." United States v. Boylan, 898 ________________________ F.2d 230, 241-42 (1st Cir. 1990), cert. denied, 498 U.S. 849 _____________ (1990) (citations omitted). Evidence of participation in the conspiracy may include "inferences from surrounding circumstances, such as acts committed by the defendant that furthered the conspiracy's purposes." Gomez-Pabon, 911 F.2d at ___________ 853. Furthermore, the government is under no duty to prove that the defendant knew each of the objectives of the conspiracy or all the details. Id. ___ Pezzullo and Dolber do not deny that there was a conspiracy to commit wire fraud, and the record leaves no doubt that one existed. They argue, however, that the government did not prove that they joined the conspiracy. Evidence relating to the substantive offenses discussed in Part II.A, also supports the jury verdict of conspiracy. Moreover, once the evidence establishes the existence of a conspiracy, lesser evidence may suffice to show a defendant's connection with the overall conspiracy. United States v. Smith, 726 F.2d 852, 866 (1st Cir. ______________________ 1984). As shown above, Pezzullo was aware that the second purchasers did not themselves provide the down payments on the market price, although required to so do by the HUD-1 forms that she and Cassiere had them sign. She also saw that the same individuals repeatedly attended closings on properties they certified would be owner-occupied. She was aware of the significant differences in the prices of the two sales in the -19- 19 land flips. At the first flip Cassiere discussed with Pezzullo prior sales of 59-61 Howard Street. Pezzullo had done the title work for that closing, and Cassiere was interested in learning what the earlier sale prices were to see if he could justify the higher price to be paid in the double closing. An inference could have been drawn that Dolber followed Monteiro's wishes that her appraisals support the higher sales prices in the second flips. She repeatedly misstated the condition and occupancy of the properties she appraised, thereby increasing the amounts the lenders would loan on the security of the properties. Dolber's use of her nephew and his wife as straws in an attempt to purchase 30-32 Water Street for her was further evidence that she was aware of how DeNunzio and Monteiro conducted illegal property sales. Don Peters, of First Union Mortgage Corporation, became suspicious about an appraisal that Dolber had conducted on a mortgage First Union purchased from Rate Line. He asked Dolber to explain the apparent increase in the value of the property within one day which he noted from his review of Banker and Tradesmen, a listing of property values and closing dates. Dolber called DeNunzio, told him of her conversation with Peters, and asked, "what's that all about?" In a subsequent conversation, DeNunzio told Dolber that he had checked out the situation, that there had been a prior foreclosure sale, but that she would not have known about it because that sale had not been recorded at the time she did -20- 20 the appraisal. When Dolber told him that Peters had requested a written response, DeNunzio told her that he wanted to review the letter before she sent it out. The letter Dolber wrote Peters provided an explanation similar to the one DeNunzio had given her: the low first sale price was due to the fact that the property was purchased from foreclosure, and thus did not reflect the true market value. At the time she conducted her appraisal, none of her data sources mentioned that sale. On another occasion Dolber called DeNunzio and asked him to meet her outside a bar but refused to tell him why she wanted to do so. He met her there and they had their conversation inside her car. Dolber told him that she needed photographs of four of the properties she had appraised since Monteiro, and not she, had taken the photographs. She explained that she needed the pictures in her records, which the United States government had requested. He agreed to provide her with the pictures. The evidence supports the jury finding that Pezzullo and Dolber were knowing and willing participants in a conspiracy to defraud the lending institutions. The government is not required to prove that each co-conspirator knew every detail of the scheme; "[a]ll that is required is to show 'the essential nature of the plan and their connections with it.'" United ______ States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir.) ___________________________ (quoting Blumenthal v. United States, 332 U.S. 539, 557 (1947)), ___________________________ -21- 21 cert. denied sub nom. Castro-Poupart v. United States, 492 U.S. ______________________ ________________________________ 910 (1989). III. Questions Asked By the Jurors At the beginning of the trial, before any of the attorneys had made opening statements, the court told the jury that it could ask the witnesses questions. The court explained that the questions had to be written; that the written questions would be submitted to the court, which would review them; and that the court might not ask a jury question if the question could not be put in a proper legal form or it "couldn't make any legal difference at all." During the 24-day trial, the court asked the witnesses eleven questions that the jurors had submitted. The defendants did not object to the court following the practice thus to ask questions or, indeed, to any particular question asked. "In the absence of a timely objection our review is limited to examining the record for plain error, and we will correct only particularly egregious errors . . . that seriously affect the fairness, integrity or public reputation of judicial proceedings." United States v. Munson, 819 F.2d 337, 340 (1st ________________________ Cir. 1987) (internal quotations omitted). In United States v. Sutton, 970 F.2d 1001 (1st Cir. _______________________ 1992), decided after the trial in the present case, we upheld the actions of the same district judge in employing this practice in a mail and wire fraud prosecution, in which the court asked witnesses seven questions submitted by the jurors. We held that -22- 22 "especially in complex cases," "allowing juror-inspired questions in a criminal case is not prejudicial per se, but is a matter ______ committed to the sound discretion of the trial court." Id. at __ 1005. We noted that other circuits similarly had so concluded. Id. __ We explained that "[a]llowing jurors to pose questions during a criminal trial is a procedure fraught with perils. In most cases, the game will not be worth the candle. Nevertheless, we are fully committed to the principle that trial judges should be given wide latitude to manage trials." Id. __ Although we stated that "in most situations, the risks inherent in the practice will outweigh its utility," we held that we would review the propriety of the practice on a case-by-case basis based on the totality of the circumstances. Id. ___ In Sutton, we held that for four reasons, the ______ court's asking of the juror questions was not reversible error. First, Sutton "neither objected nor requested any additional safeguards." Id. at 1006. Second, "[b]ecause [Sutton] was a ___ ______ factually complex case in which a greater-than-average risk of jury confusion existed, the positive value of allowing juror- inspired questioning was relatively high." Id. Third, the court ___ used appropriate procedural safeguards, such as requiring that the questions be presented in writing to the court and explaining to the jury that the court might not ask all juror questions. Id. Fourth, "the questions themselves were few in number and ___ bland in character." Id. (footnote omitted). ___ -23- 23 The first three reasons unquestionably are equally applicable here: the defendants did not object to the questioning, the case was factually complex, and the court adopted procedural safeguards nearly identical to those in Sutton. ______ Sutton involved seven jury questions the court asked ______ during a 2 1/2 day trial. The present case involves eleven questions asked during a 24-day trial. The issue, thus, is whether this significantly larger number of questions so seriously undermined the fairness of the trial as to constitute plain error. We answer that question negatively. The juror questions the court asked were relatively "bland in character," id., and designed to clarify and explain __ testimony already given. For example, one juror wanted Paul Pires to identify the word that followed his signature on one of the exhibits. The word was "Pres." Another juror wanted Nancy Rullo to explain what the "preliminary title" that she referred to in her testimony meant. One juror sought clarification of who had done the appraisal the witness was discussing. Although the defendants have objected to allowing juror questions and to the number asked in this case, they have not now argued that any specific question was improper. Other courts of appeals have upheld convictions where the court asked varying numbers of questions that the jurors proposed. In United States _____________ v. Lewin, 900 F.2d 145 (8th Cir. 1990), the court, over _________ objections made in the jury's presence, asked six questions. The -24- 24 Fourth Circuit upheld a conviction in which the trial court asked ninety-five juror questions during a three-week trial. DeBenedetto v. Goodyear Tire & Rubber Co., 754 F.2d 512 (4th Cir. _________________________________________ 1985). The Fifth Circuit approved the asking of one juror question. United States v. Callahan, 588 F.2d 1078 (5th Cir.), __________________________ cert. denied, 444 U.S. 826 (1979). ____________ In each of these cases the court focused on the effect of the questions on the trial, not the number of questions, in and of itself. Thus, the Lewin court approved the _____ asking of juror questions because they were factual in nature and merely "sought clarification of previous testimony and did not introduce new or unrelated subject matter." 900 F.2d at 148. In DeBenedetto, despite the large number of questions, the court ___________ "examined carefully each of the questions propounded by the jurors and [] perceive[d] no bias in any of the questions." 754 F.2d at 517. In Sutton, we noted that "juror-inspired ______ questioning becomes particularly troublesome when questions are directed at the [criminal] defendant." 970 F.2d at 1006 n.6. In Sutton, the court asked only one such question of the defendant. ______ Id. ___ In the present case, the court asked the defendant Cassiere four juror questions during his testimony which spanned three days. Here, as in Sutton, the "appellant did not object to ______ [the questions]; and he has not argued on appeal that th[ese questions were] improper or harmful." Id. We cannot say that __ the district court committed plain error in asking the defendant -25- 25 Cassiere four relatively benign juror questions during Cassiere's three days of testifying. The defendants argue, however, that by asking the jury questions during the testimony of the witnesses, the court improperly interfered with their ability to conduct direct and cross-examination of the witnesses. The district court, however, has broad discretion to control trial proceedings. Id. at 1005 __ ("we are fully committed to the principle that trial judges should be given wide latitude to manage trials"); see also United ________ ______ States v. Slone, 833 F.2d 595, 597 (6th Cir. 1987) (The court ________________ "must see that the issues are not obscured and that the testimony is not misunderstood."). While objections from opposing counsel and sidebars may be similarly disruptive of counsel's examination, they are interruptions that are also critical to the fair and rational progression of the trial. We cannot say that the court's asking of the jurors' questions so interfered with counsels' questioning of the witnesses as to constitute a denial of the defendants' right to a fair trial. Although we uphold the district court's asking the juror questions in this case, we reiterate what we said in Sutton ______ regarding the use of this practice. As we there indicated, the practice should be reserved for exceptional situations, and should not become the routine, even in complex cases. The district court should inform counsel at the earliest possible time of its intention to use this technique and allow counsel the opportunity to object. The court should instruct the jurors that -26- 26 they should limit their questions to important points, that at times the rules of evidence will dictate that the court not ask a question, and that the jurors should draw no implication from the court's failure to pose a juror-proposed question to the jury. The jurors should reduce their questions to writing and pass them to the court. Before asking a question, the court should offer a sidebar conference to give counsel the opportunity to object. Finally, in its charge, the court should include a prophylactic instruction, along the lines suggested in Sutton. ______ IV. Evidentiary Rulings The "trial court's rulings on relevance and admissibility will not be disturbed unless there is an abuse of discretion." United States v. Drougas, 748 F.2d 8, 24 (1st Cir. _________________________ 1984). A. Admission of the Publication County Comps _________________________________________ Dolber challenges the court's admission of seven reports from the publication County Comps. ____________ Federal Rule of Evidence 803(17) allows, as an exception to the hearsay rule, the admission of "[m]arket quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations." County Comps publishes a monthly listing of ______________ properties sold, the sales prices, and the dates the sales were closed. Real estate brokers, insurance agents, and appraisers buy County Comps. The operating manager of County Comps _____________ _____________ -27- 27 testified that the reports admitted were authentic. Dolber referred to County Comps as her source of data for comparable _____________ sales in her appraisals. Dolber argues that "although the County Comps listings at first blush appear to deal with compilations of relatively straightforward facts, this evidence required a subjective analysis of other facts." Individuals might differ in the conclusions they draw from the data in County Comps. But ____________ that is not the test for admission of the publication. The evidence shows that County Comps is a "published compilation[], ____________ generally used and relied upon by" appraisers. The court did not abuse its discretion in admitting the evidence. B. Questions Asked of Cassiere Regarding Professional _____________________________________________________ Standards _________ Cassiere argues that the government held him to a higher standard of conduct because he is an attorney, based on the following colloquy between the prosecutor and Cassiere: Q. And in addition to being aware of the responsibilities as a closing attorney, sir, you as an attorney have certain responsibilities in conjunction with representing anybody, right? A. Yes. Q. And those duties and responsibilities are set forth in such things as a canon of ethics, are they not? Cassiere objected and, after a sidebar conference, the court overruled the objection and explained: -28- 28 I'm going to be very express [in my charge] that sloppy or careless work is not criminal. It may be malpractice, but it's not criminal. But I've decided . . . that the failure to make a disclosure of material fact when under a duty to make a disclosure which duty is known to the individual with a specific intent to defraud by failing to make the disclosure constitutes a violation of the statute. The questioning continued: Q. You're aware of the canons of ethics governing attorneys? A. I am. Q. And the disciplinary rules? A. I am. Q. And I gather you were also a former prosecutor? A. I was. Q. You're aware of the criminal laws? MR. O'BRIEN: Objection, your honor. THE COURT: No. overruled. A. I'm not aware of all the criminal laws. I'm aware of the criminal laws that I enforced. Q. You're aware of, you were aware in June of 1990 of these things as well, I gather? A. I don't know what you mean by these things. Q. The canons of ethics? A. Yes. Q, The disciplinary rules? A. Yes. -29- 29 Q. And you recognized that as an attorney you were under certain obligations? A. Under certain obligations, yes. Q. Those obligations included, included a responsibility to act truthfully? A. Uh-huh. Q. And honestly? A. Correct. Q. And disclose certain information? A. I don't know what you mean by disclose certain information. The court then sustained an objection and the prosecutor moved on. To comprehend Cassiere's role in this scheme, it was important for the jury to understand how Cassiere and others viewed his duties as a closing attorney and whether he believed he had violated those duties. These facts were important for the jury in determining whether his participation in the scheme to defraud his clients, the lending institutions, was intentional and knowing. The district court has discretion to determine the scope of cross-examination, United States v. Tracey, 675 F.2d ________________________ 433, 437 (1st Cir. 1982), and did not abuse its discretion in allowing the preceding colloquy. C. Exclusion of Land Deeds _______________________ Cassiere challenges the court's exclusion of three land deeds "that the defendant said supported his view of why the real estate values in question were reasonable." Cassiere -30- 30 testified that he relied on the prior deeds for sales in 1986 and 1987 in making his title examination for properties that were the subject of the indictment. Cassiere testified that he also relied on those deeds, which listed past sale prices, as indications of the value of the property at the time he conducted the title searches. The court excluded these deeds "on the ground of relevance [because] they're [sic] conveyance is too remote in time given, and I take judicial notice at the side bar of the . . . marked decline in real estate values within the period of time and material to this lawsuit." The court allowed Cassiere to testify that these deeds formed the basis of his conclusion that the second sale prices in the land flips were justified. Since the deeds were for sales that occurred four to five years before those at issue in the case, and since the evidence was cumulative to Cassiere's testimony, the court did not abuse its discretion in excluding the deeds. D. Admission of Evidence Under Rule 404(b) _______________________________________ Pezzullo challenges the court's admission under Federal Rule of Evidence 404(b) of evidence concerning a real estate transaction not charged in the indictment. Dolber argues that the court erred in admitting under that rule evidence concerning a similar transaction and a tape recorded conversation between herself and DeNunzio. 1. The Two Land Transactions Not Charged in The ________________________________________________ Indictment __________ -31- 31 Cassiere entered into negotiations with Hybernia Savings bank to buy 23 Newark Street, which the bank recently had foreclosed. Pezzullo signed a purchase and sales agreement with the bank for $65,000. Cassiere offered to sell the property to Robert Felicio and Richard Rego. His plan was to pay Felicio and Rego to renovate the property and, thus, provide them with money for their down payment. Before work was begun on the property, Cassiere had Felicio and Rego inquire of Rate Line whether they could qualify for a mortgage loan. Cassiere told DeNunzio that he was structuring the sale as a "no money down flip." After receiving loan information from Felicio and Rego at the law firm, Monteiro told DeNunzio that he was upset that Felicio and Rego "were sitting in the office along with Joe Cassiere [and] were making jokes about Glenn Monteiro looking the other way in regards to processing a loan the way it should be." Cassiere and Pezzullo decided that they would not make enough profit on the resale so they told Felicio that the deal was off. Cassiere later negotiated a second purchase agreement with Hybernia for $35,000. DeNunzio asked Dolber to appraise the property, which she valued at $157,000. The same month, Pezzullo purchased the property for $35,000. Dolber also sought to buy property on Water Street using her nephew and his wife as straw buyers due to her own poor credit rating. See II.A above. The loan fell through when the ___ lender refused to do any more business with DeNunzio. -32- 32 2. The Tape Recording __________________ Following inquiries by the lending institutions, DeNunzio tape-recorded several telephone conversations. After an evidentiary hearing, the court admitted a tape containing a phone conversation between Dolber and DeNunzio. The conversation was short, and according to DeNunzio was recorded by accident, because the call from Dolber came in on his call waiting service while he was conducting another conversation that he was taping. Once DeNunzio finished with each conversation he turned the recorder off and back on again to record his own statement of when and with whom the conversation had taken place. After recording this information, he clicked Dolber back in through call waiting and recorded his conversation with her. In that conversation, Dolber told DeNunzio that although Karen Belanger did not work at Whitinsville Water Company, they could fill in the appropriate employment verification forms as though she did, and at whatever salary was necessary. The recording was cut off abruptly at the end. 3. Admissibility of the Evidence _____________________________ (a) Prior to reviewing the court's admission of the foregoing evidence under Rule 404(b), we must determine whether the making of the tape recording was legal, and if so, whether the government adequately demonstrated the tape's authenticity. Title 18 of the United States Code, section 2511(2)(d) provides: -33- 33 It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communications or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State. 18 U.S.C. 2511(2)(d) (1988). A defendant seeking to suppress a tape recording "bears the burden of proving by a preponderance of the evidence," United States v. Vest, 639 F. Supp. 899, 907 (D. Mass. 1986), ______________________ aff'd, 813 F.2d 477 (1st Cir. 1987), either "(1) that the primary _____ motivation, or (2) that a determinative factor in the actor's motivation for intercepting the conversation was to commit a criminal, tortious, or other injurious act." Id. at 904. ___ After an evidentiary hearing, the district court ruled that it was "not persuaded by a fair preponderance of the evidence that Mr. DeNunzio made the recording of Ms. Dolber for a criminal, tortious or injurious purpose; at most, the Court finds that if anything Mr. DeNunzio made the tape recording of the conversation in order to prevent future distortions by a participant." The court concluded that DeNunzio did not make the tape to blackmail Dolber or as part of a conspiracy. This factual finding reflecting the court's familiarity with the evidence and its evaluation of witness credibility, is not clearly erroneous. -34- 34 After the evidentiary hearing, the court found that the government had established a proper foundation for the tape's authenticity. Dolber challenges that conclusion because she views DeNunzio's testimony as inconsistent, incredible, and suspect. Credibility determinations are for the district court, and Dolber does not show that the finding was clearly erroneous. (b) Rule 404(b) provides: Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . . Fed.R.Evid. 404(b). Rule 404(b) "is one of inclusion which allows the introduction of evidence of other crimes, wrongs, or acts unless the evidence tends to only prove criminal disposition." United ______ States v. Fields, 871 F.2d 188, 196 (1st Cir.), cert. denied, 493 ________________ ____________ U.S. 955 (1989). Determining the admissibility of evidence under Rule 404(b) requires a two-pronged inquiry. "The trial judge first determines whether the evidence has some 'special' probative value showing intent, preparation, knowledge or absence of mistake." United States v. Garcia, 983 F.2d 1160, 1172 (1st Cir. _______________________ 1993). "Next, the judge balances the probative value of the evidence against the danger of unfair prejudice, pursuant to -35- 35 Fed.R.Evid. 403." Id. (footnote omitted). Rule 403 provides ___ that: Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed.R.Evid. 403. On appeal, we review the Rule 404(b) determination for abuse of discretion. Garcia, 983 F.2d at 1172. ______ Knowledge and intent were critical issues in this case. The Water Street transaction was probative of Dolber's knowledge and intent in two significant ways. Unlike the other land flips, in which she served only as an appraiser, in this instance Dolber was involved in an actual attempt to obtain a mortgage loan. The evidence showed Dolber's submitting fraudulent documents concerning Karen Belanger's employment. The Newark Street transaction reflected Pezzullo's functioning in a different role from that in the other land flips. Here, Cassiere and Pezzullo, and not Rate Line, masterminded the flip and intended to buy the property themselves. This evidence was probative of Pezzullo's knowledge of how a flip was arranged. The tape recording was probative of Dolber's knowledge concerning how to go about defrauding a lender. -36- 36 All of this evidence thus satisfied the first prong of the rule 404(b) test, since it had "some 'special' probative value showingintent, preparation,knowledge or absenceof mistake." Garcia, 983 F.2d at 1172. ______ On the second prong of the rule 404(b) test, "[w]e afford 'considerable leeway' to a district court in its Rule 403 balancing, and we will reverse a district court's balancing only in 'exceptional circumstances.'" Id. at 1173 (internal __ quotations and citations omitted); see also United States v. ________ _________________ Zeuli, 725 F.2d 813, 816 (1st Cir. 1984) ("the test of _____ admissibility is committed primarily to the trial court"). The evidence of the two land transactions and the tape recording were probative as to intent and knowledge, critical elements of the crimes charged, and there were no "exceptional circumstances" indicating an abuse of the court's discretion in admitting the evidence. V. The Jury Instructions A. Challenged Jury Instructions ____________________________ The defendants challenge two of the trial court's jury instructions. We review for abuse of discretion. United ______ States v. Picciandra, 788 F.2d 39, 46 (1st Cir.), cert. denied, ____________________ ____________ 479 U.S. 847 (1986). We must look at the instructions in light of the evidence and determine whether they "'fairly and adequately submit[] the issues in the case to the jury.'" Id. ___ (quoting United States v. Fishbach & Moore, Inc., 750 F.2d 1183, _______________________________________ 1195 (3d Cir. 1984), cert. denied, 470 U.S. 1029 (1985)). The _____________ -37- 37 trial court has "considerable latitude" in charging the jury. Id. ___ 1. Failure-to-Disclose Instruction _______________________________ Cassiere and Pezzullo argue that the court's failure-to-disclose instruction "impermissibly allowed the jury to predicate a finding of guilt on a failure to disclose that was rooted in the defendant's contractual or professional status or relationship with other parties." The court told the jury: A failure to disclose a material fact may also constitute a false or fraudulent misrepresentation if, one, the person was under a general professional or a specific contractual duty to make such a disclosure; and, two, the person actually knew such disclosure ought to be made; and three, the person failed to make such disclosure with the specific intent to defraud. The court continued: The government has to prove as to each count considered separately, that the alleged misrepresentation as charged in the indictment was made with the intent to defraud, that is, to advance the scheme or artifice to defraud. Such a scheme in each case has to be reasonably calculated to deceive a lender of ordinary prudence, ordinary care and comprehension. The court also instructed: [I]t is not a crime simply to be careless or sloppy in discharging your duties as an attorney or a[s] an appraiser. That may be malpractice, but it's not a crime. -38- 38 "It is well settled that breach of a fiduciary duty, standing alone, does not constitute mail fraud." United States _____________ v. Greenleaf, 692 F.2d 182, 188 (1st Cir. 1982), cert. denied, _____________ ____________ 460 U.S. 1069 (1983). However, one of the "elements that transform[s] a fiduciary breach into mail fraud . . . . is where there is a recognizable scheme formed with specific intent to defraud." Id. This is equally true for wire fraud. Cassiere ___ admits as much when he writes in his brief: "There may be circumstances in which a violation of a non-criminal standard such as the canons of ethics could conceivably be probative on the issue of whether or not there was fraud." Cassiere states both that the record is unclear as to who his client was, and somewhat inconsistently that "[h]is ostensible client was the bank writing the mortgage for each piece of property." The latter statement is correct. Cassiere, assisted by his law partner Pezzullo, was the closing attorney and represented the lenders, which he acknowledged at trial. As attorneys representing the lenders, Cassiere and Pezzullo had a fiduciary duty toward them, which Cassiere also admitted at trial. In United States v. Silvano, 812 F.2d 754, 759 (1st _________________________ Cir. 1987), we held that "the affirmative duty to disclose material information arises out of a government official's fiduciary relationship to his or her employer." Id. ___ "Concealment of material information by an employee under a duty to disclose to his or her employer 'under circumstances where the non-disclosure could or does result in harm to [the employer] is -39- 39 a violation of the [mail fraud] statute.'" Id. (quoting United ___ ______ States v. Bronston, 658 F.2d 920, 926 (2d Cir. 1981), cert. ____________________ _____ denied, 456 U.S. 915 (1982)). ______ That reasoning is equally applicable here, where the lenders, the clients of the Cassiere & Pezzullo firm, viewed the closing attorney as their "eyes and ears," and "expect[ed] fundamental honesty" from them. In its written instructions to the closing attorneys, one lender stated: "While we have tried to cover our procedures in these closing transactions, we are relying on your judgment and experience as a closing agent to properly handle and complete our loan closing. However, when you are in doubt of a situation, please confer with us prior to closing." The court's failure-to-disclose instruction correctly stated the law as it applied to Cassiere and Pezzullo in view of their fiduciary duty to the lenders. 2. Willful Blindness Instruction _____________________________ The defendants challenge the court's willful blindness instruction: Now, the element of knowledge that I just mentioned for Counts 1 through 15, that may be satisfied by an inference, drawn from proof, that the particular person accused deliberately closed his or her eyes to what would otherwise have been obvious to that person. You may infer knowledge if you find beyond a reasonable doubt that the particular person accused refused to be enlightened, refused to take notice, but only where you find the individual is aware of a high probability that the fact exists and where the individual in -40- 40 his or her own mind does not believe -- strike that, does not disbelieve the fact where there's a high probability that the fact that's being misrepresented actually exists and where the person in his or her own mind doesn't disbelieve that fact. Stated another way, a person's knowledge may be inferred from a willful blindness to the existence of the fact. It's entirely up to you whether you find any deliberate closing of the eyes, any inference to be drawn from such evidence. Remember, though, evidence showing negligence or mistake is not enough to support a finding of willful blindness. The ultimate fact of criminal intent may be established by circumstantial evidence if you are satisfied that it is proven beyond a reasonable doubt. Caution is necessary in giving a willful blindness instruction "'because of the possibility that the jury will be led to employ a negligence standard and convict a defendant on the impermissible ground that he should have known [an illegal act] was taking place.'" United States v. __________________ Littlefield, 840 F.2d 143, 148 n.3 (1st Cir.) (quoting United ___________ ______ States v. White, 794 F.2d 367, 371 (8th Cir. 1986)), cert. ________________ _____ denied, 488 U.S. 860 (1988). A court properly gives such an ______ instruction when "a defendant claims a lack of knowledge, the facts suggest a conscious course of deliberate ignorance, and the instruction, taken as a whole, cannot be misunderstood as mandating an inference of knowledge." Id. at 147. ___ The defendants did not deny the existence of the scheme to defraud, but contended only that they were unaware of it. Furthermore, the instruction made it clear to the jurors -41- 41 that it was for them to determine whether the defendants had closed their eyes to what should have been apparent to them. The court three times used the word "may" and explained that "[i]t's entirely up to you whether you find any deliberate closing of the eyes." See Picciandra, 788 F.2d at 46 (approving an instruction ___ __________ that permitted but did not require the jury to draw an inference of willful blindness). Although the government's main contention at trial was that all three defendants were knowing participants in the scheme, the government presented evidence from which the jury could have concluded that if they did not know what was going on, it was only because they chose to turn a blind eye. "Guilty knowledge may be inferred where instances of fraud are repeatedly brought to a defendant's attention without prompting alteration of his facilitative conduct." United States v. Nivica, 887 F.2d _______________________ 1110, 1114 (1st Cir. 1989), cert. denied, 494 U.S. 1005 (1990). ____________ Cassiere argues that, like the failure-to- disclose instruction, this instruction suggests to the jury that although "negligence or mistake is not enough to support a finding of willful blindness, . . . [anything] more than negligence is enough." Thus, the argument goes, the jury could have concluded that the breach of canons of ethics alone could constitute "more than negligence," and lead to conviction. The instruction explained that "evidence showing negligence or mistake is not enough." It also told the jury that it could consider "any deliberate closing of the eyes." As with the -42- 42 failure-to-disclose instruction, breach of a fiduciary duty, alone, would not prove willful blindness, but the jury could infer knowledge if it concluded that the defendants "deliberately" closed their eyes to facts that they were duty- bound to report to the lending institutions. Cassiere further argues that the willful blindness instruction was "logically inconsistent with the Court's charge on failure to disclose a material fact," and that "[t]he government cannot have it both ways." The willful blindness instruction, however, related to the defendant's knowledge of what occurred. The failure-to-disclose charge, on the other hand, instructed the jury on determining whether the defendants were involved in the scheme to defraud. Finally, Dolber argues that the admission of the rule 404(b) evidence to prove her knowledge of the scheme was inconsistent with the government's contention that she remained willfully blind to the scheme. We know of no authority, however, that prohibits the government from proceeding on alternate theories in a criminal case. B. Refusal to Define Reasonable Doubt __________________________________ Cassiere, Pezzullo, and Dolber challenge the court's denial of Dolber's request for an instruction defining reasonable doubt. In United States v. Olmstead, 832 F.2d 642 (1st Cir. __________________________ 1987), cert. denied, 486 U.S. 1009 (1988), we analyzed in detail ____________ the need for instructing the jury on the meaning of reasonable doubt. We explained that "[m]ost efforts at clarification result -43- 43 in further obfuscation of the concept," id. at 645, and held that ___ "an instruction which uses the words reasonable doubt without further definition adequately apprises the jury of the proper burden of proof. This does not mean, of course, that the phrase can be buried as an aside in the [jury charge]." Id. at 646. In ___ essence, we concluded that the district court was in the best position to determine whether, and if so how, to define reasonable doubt. See also Littlefield, 840 F.2d at 146; United ________ ___________ ______ States v. Rodriguez-Cardona, 924 F.2d 1148, 1160 (1st Cir.) ("We ___________________________ have emphasized in the past, and do so again here, that reasonable doubt does not require definition."), cert. denied, ____________ 112 S. Ct. 54 (1991). There is no suggestion that the reference to reasonable doubt was "buried as an aside" in the court's charge to the jury. To the contrary, the court instructed the jury that "should there be any reasonable doubt of any essential element which the government has to prove as to any of these specific 16 charges, then the person or persons so charged must have the benefit of that reasonable doubt and cannot be convicted on the charge or charges." In its instructions, the court mentioned "reasonable doubt" twenty-four more times. The court did not abuse its discretion in refusing to define reasonable doubt. Relying upon Judge Torruella's concurring opinion in Littlefield in which he stated that "I am of the opinion that the ___________ -44- 44 failure to grant an instruction explaining the term 'proof beyond a reasonable doubt' is an error of constitutional dimension, striking at the very heart of the presumption of innocence," 840 F.2d at 151, the defendants urge this court to reconsider the issue en banc. In view of this court's settled precedent, _______ however, this panel sees no occasion to suggest such reconsideration by the full court. C. Failure to Give a Maniego Instruction _____________________________________ In United States v. Maniego, 710 F.2d 24, 28 (2d _________________________ Cir. 1983), the Second Circuit approved the trial court's jury instruction "that an attorney is not held to a higher standard of conduct, or legal obligation, to verify independently the truth of the information given by a client." In United States v. _________________ Piccianana, 788 F.2d 39 (1st Cir. 1986), we held that the __________ district court properly refused the defendant's request for a Maniego instruction because "the government does not try to raise _______ an inference that Lucid should be held to a higher standard than normal, nor did its questions have the effect of raising such an inference." Id. at 46. Lucid, an attorney, was convicted of __ aiding and abetting Picciandra in evading income taxes. He argued that a Maniego instruction was required because the _______ government had suggested that Lucid was culpable in not going beyond what his client had told him. Cassiere and Pezzullo did not request a Maniego _______ instruction at trial and claim on appeal that the court committed plain error in not giving such an instruction. They apparently -45- 45 interpret the Maniego instruction as required whenever the _______ government seeks to "raise an inference that the defendant should be held to a standard higher than normal because of his status as a lawyer and his position as a former prosecutor." The Maniego _______ instruction, however, is more limited; it deals with the question whether a lawyer is to be held to a higher standard of conduct "to verify independently the truth of the information given by a client." Maniego, 710 F.2d at 28. _______ In the present case, the charges against Cassiere and Pezzullo were not that they failed to check further on information their clients (the lenders) had given them, but that they defrauded their clients by failing to disclose the land flips that inflated the sales prices of the mortgaged properties. The district court cannot be faulted, and certainly did not commit plain error, because, in a case involving a significantly different issue from Maniego, it failed to give a Maniego _______ _______ instruction that the defendants had not requested. In any event, the record does not show that the government sought to hold Cassiere or Pezzullo to higher standards because of their status as attorneys. Rather, the government introduced evidence of Cassiere's and Pezzullo's services as attorneys representing the lending institutions and the fiduciary duty they owed to those lenders because those facts were central to understanding their roles in the scheme. See ___ United States v. Kaplan, 832 F.2d 676, 683 (1st Cir. 1987) _________________________ (Maniego instruction not required where the "prosecutor did not _______ -46- 46 attempt to create the impression that [the attorney] should be held to a higher standard of care" and where comments during trial about the defendant's status as an attorney "were directed towards [defendant's] role (as a lawyer) which was central to the scheme"), cert. denied, 485 U.S. 907 (1988); Picciandra, 788 F.2d ____________ __________ at 46. As noted, the court instructed the jury that "it is not a crime simply to be careless or sloppy in discharging your duties as an attorney or an appraiser. That may be malpractice, but it's not a crime." There was no plain error in the district court's failure to give a Maniego instruction. _______ VI. The district court's refusal to give Dolber a downward adjustment under the Sentencing Guidelines United States Sentencing Guideline Section 3B1.2(b) provides that if the defendant "was a minor participant in any criminal activity," the offense level should be decreased by two levels. Dolber contends that the district court improperly refused to give her such a downward adjustment. "We review the trial court's determination of role in the offense only for clear error." United States v. Panet- _______________________ Collazo, 960 F.2d 256, 261 (1st Cir.), cert. denied sub nom. Diaz _______ _____________________ ____ v. United States, 113 S. Ct. 220 (1992). Since a ruling on a ________________ downward adjustment is highly fact specific, we give great deference to the trial court's action. United States v. Ocasio, _______________________ 914 F.2d 330, 333 (1st Cir. 1990). At the sentencing hearing, the district court explained: "How do I justify calling her a minor participant when -47- 47 the evidence seems fairly clear that she knew what she was doing and she knew she was acting inappropriately here repetitively? . . . . She seems key to the successful operation of this fraudulent scheme, just like an attorney is." The lenders relied on her inflated appraisals in making their mortgage loans, and without those appraisals the scheme might not have succeeded. Although DeNunzio, Monteiro, and Cassiere were more culpable than Dolber, the straw buyers who were Dolber's co-defendants were relatively minor cogs in the scheme to defraud the lenders. Thus, Dolber was not "less culpable than most other participants." U.S.S.G. 3B1.2, comment. (n.3). The court's denial of a downward adjustment was not clear error. Affirmed. ________ -48- 48