USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-1135

 LUIS BONILLA, ET AL.,

 Plaintiffs, Appellees,

 v.

 VOLVO CAR CORPORATION,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Jaime Pieras, Jr., Senior U.S. District Judge]

 Before

 Selya, Circuit Judge,
 
Campbell, Senior Circuit Judge,

and Boudin, Circuit Judge.

 Gael Mahony with whom Michael D. Vhay, Andres W. Lopez,
Anne L. Showalter, Hill & Barlow, P.C., Rafael Perez-Bachs, Nereida
Melendez-Rivera and McConnell Valdes were on brief for defendant
Volvo Car Corporation.
 Daniel L. Goldberg, Alicia L. Downey, Bingham, Dana & Gould
LLP, Charles H. Lockwood II, Vice President & General Counsel,
Association of International Automobile Manufacturers, Inc., and
Phillip D. Brady, Vice President & General Counsel, American
Automobile Manufacturers Association, on brief for Association of
International Automobile Manufacturers, Inc. and American
Automobile Manufacturers Association, Amici Curiae.
 Allan Kanner with whom Conlee Schell Whiteley, Allan Kanner &
Associates, P.C., Paul H. Hulsey, Frederick J. Jekel, Theodore H.
Huge, Ness, Motley, Loadholt, Richardson & Poole, P.A., Jose F.
Quetglas Jordan, Eric Quetglas Jordan, Zygmunt Slominski, Quetglas
Law Offices, Daniel Harris and Law Offices of Daniel Harris were on
brief for plaintiffs Luis Bonilla, et al.

July 28, 1998

 
 

 BOUDIN, Circuit Judge. In these seven related appeals,
we are asked to examine numerous rulings and decisions in a complex
civil suit brought under the Racketeering Influenced and Corrupt
Organizations Act, 18 U.S.C. 1962 ("RICO"). This opinion
addresses the first of the appeals, the principal appeal (No. 97-
1135) of Volvo Car Corporation ("Volvo"), and two companion
opinions resolve the remaining appeals. We briefly set forth the
procedural history of the case as background for all three
opinions.
 The plaintiffs are a class of individuals and
corporations who, between 1983 and 1993, among them purchased 9,077
cars of the 200 series manufactured by Volvo, a Swedish automobile
manufacturer. The cars were imported to Puerto Rico by Trebol
Motors Distributor Corporation ("Trebol Distributor"), and sold for
the most part by Trebol Motors Corporation ("Trebol Motors"). Both
of these companies (together "Trebol") were owned by Jorge Gonzalez
and, after his death, by his widow and son, defendants Conchita
Navarro de Gonzalez and Ricardo Gonzalez Navarro (together "the
Gonzalez defendants").
 Plaintiffs have advanced various arguments at different
times, but the claims coalesce around one general complaint: that
Volvo, Trebol, and the Gonzalez defendants conspired to violate,
and did in fact violate, RICO by engaging in hundreds of predicate
acts of mail and wire fraud. 18 U.S.C. 1341, 1343, 1962. The
plaintiffs allege that the acts were part of a complex and
multifaceted scheme to defraud Puerto Rican purchasers by
overcharging them for series 200 Volvo cars. 
 The plaintiffs' first complaint was filed in the district
court on June 16, 1992, and named as defendants Volvo, Trebol, and
the Gonzalez defendants, and certain other companies no longer
parties to the case. The parties spent nearly four years in
bitterly waged discovery battles. On April 26, 1996, the district
court granted the plaintiffs' motion to file a Third Amended
Complaint, which is the operative complaint in the suit. Trial was
scheduled to begin before a jury on Monday, June 24, 1996. 
 On the afternoon of Friday, June 21, 1996--almost
literally the eve of trial--Trebol and the Gonzalez defendants
presented the district court with a joint notice consenting to
entry of default "as to the factual averments of the Third Amended
Complaint." The district court entered a "final Partial Judgment
on the issue of liability" against Trebol and the Gonzalez
defendants on July 2. 
 Trial proceeded with Volvo as the sole defendant. The
district court had earlier bifurcated the proceedings, intending
that the jury would produce a general liability verdict first and
then, if necessary, a verdict regarding damages. Indeed, the
district court envisioned two separate damages proceedings, one to
determine class-wide damages, and a second (probably involving a
special master) to determine the damages of individual class
members. However, the presentation of the evidence was not
bifurcated, and the jury heard testimony regarding both liability
and damages over twenty days of trial. 
 On July 25, 1996, the twenty-second day of trial, the
jury returned a verdict finding that Volvo was liable for violating
and conspiring to violate RICO's prohibition on racketeering
activity. 18 U.S.C. 1962(c), (d). The jury also found that
Volvo had used or invested income from a pattern of racketeering
activity, id. 1962(a), but that the plaintiffs had not been
injured by this violation. 
 On July 31, 1996, the district court held a hearing on
damages. Neither plaintiffs nor Volvo presented further evidence,
but both presented arguments to the jury based on the evidence
already submitted. The next day, the jury found Volvo liable for
$43,197,100. The district court trebled the amount under 18 U.S.C.
 1964(c), yielding $129,591,300. The plaintiffs then moved for
prejudgment interest, attorney's fees, and costs, alleging
vexatious discovery conduct by Volvo. Volvo moved for judgment as
a matter of law or a new trial.
 On August 29, 1996, the court held a hearing on damages
as to Trebol and the Gonzalez defendants. On October 10, 1996, the
district court issued an opinion and orders denying Volvo's motion
for judgment in its favor or new trial and the plaintiffs' motion
for prejudgment interest. The court also entered a final judgment
as to all defendants (including Trebol and the Gonzalezes) in the
full amount of the trebled verdict. Volvo renewed its motion for
judgment or new trial, and Trebol and the Gonzalez defendants filed
separate motions to set aside the judgment under Fed. R. Civ. P.
59, all of which were eventually denied. 
 On March 27, 1997, the district court entered two lengthy
orders. The first order sanctioned all defendants for vexatious
conduct during discovery by declaring that the court would view
plaintiffs' submission regarding computation of attorney's fees
with indulgence. The second order awarded attorney's fees and
costs to the plaintiffs in the amount of $3,518,844.41. Trebol
Motors and Trebol Distributor had filed for bankruptcy under
Chapter 11 nearly six months before, on September 30, 1996.
 Volvo now appeals the denial of its motion for judgment
as a matter of law, for a new trial, or for a remittitur (No. 97-
1135), as well as the district court's ruling on sanctions and
attorney's fees (No. 97-1599). Trebol and the Gonzalez defendants
appeal from the entry of judgment against them (Nos. 97-1140, 97-
1143), and the Gonzalez defendants also appeal the sanction and fee
award (No. 97-1790). Finally, the plaintiffs have filed a
protective appeal asking that, in the event of a remand, this court
should require the district court to award them prejudgment
interest (No. 97-1145).
 In this opinion, we address only Volvo's appeal on the
merits; the remaining appeals are dealt with in two separate
opinions also issued today. In the instant appeal, Volvo argues
that judgment should be entered in its favor because several
elements necessary to the plaintiffs' claims were not established
by the evidence. Volvo also makes several attacks on procedural
and evidentiary rulings, which it claims warrant a remand for a new
trial.
 Volvo's main contention is that the evidence does not
support a finding that Volvo committed predicate acts of mail or
wire fraud, a crucial element of plaintiffs' RICO claim. See Ahmedv. Rosenblatt, 118 F.3d 886, 888 (1st Cir. 1997). We review the
district court's denial of Volvo's motion for judgment as a matter
of law de novo as to issues of law. We resolve credibility issues
and draw inferences in favor of the jury verdict and examine the
evidence as a whole. Still, the verdict cannot stand if no
reasonable reading of the evidence will support it. See Schultz v.
Rhode Island Hosp. Trust Nat'l Bank, N.A., 94 F.3d 721, 731 (1st
Cir. 1996). 
 To prove mail or wire fraud, plaintiffs must show three
elements: a "scheme to defraud," Volvo's "knowing and willful
participation in the scheme with the intent to defraud," and the
use of the mails or interstate wire or radio communication in
furtherance of the scheme. United States v. Cassiere, 4 F.3d 1006,
1011 (1st Cir. 1993). The conduct must "be intended to deceiveanother, by means of false or fraudulent pretenses,
representations, promises, or other deceptive conduct." McEvoy
Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791
(1st Cir.), cert. denied, 498 U.S. 992 (1990). In addition to
demonstrating the fraud, however, RICO requires the plaintiffs to
show that they were "injured in [their] business or property by
reason of" the fraud. 18 U.S.C. 1964(c).
 The plaintiffs presented the jury with "five frauds" in
which they claimed Volvo participated. These are not five isolated
acts of fraud, but different groups of activity, each comprising
multiple acts; if the activities within the group were fraudulent,
any one group would reflect multiple "predicate acts" under RICO. 
We must determine whether the evidence presented as to at least one
of the five frauds is sufficient to support the verdict. We
conclude that none of the frauds has been established against
Volvo, that the judgment against it must be reversed, and that
plaintiffs' claims against Volvo fail in their entirety.
 Excise Taxes. First, the plaintiffs claim that Volvo and
Trebol together fraudulently underreported material data to the
Puerto Rican tax authorities, resulting in reduced excise tax
payments on vehicles shipped to Puerto Rico. During the class
period, the excise tax on a car imported to Puerto Rico was a
function of its horsepower, weight, and FOB (i.e., factory-gate)
price from the manufacturer. Volvo certified to Trebol the weight
and horsepower of each car shipped to Puerto Rico, and Trebol then
disclosed this information to the tax authorities.
 Plaintiffs claim that Volvo used a computation formula
for horsepower that understated the real horsepower and thus
lowered the amount of excise tax due. According to plaintiffs'
expert on tax issues, Puerto Rico regulations prior to March 1989
required that horsepower be certified in accordance with standards
of the Society of Automotive Engineers. It is common ground that
the Society had promulgated two standards of horsepower measurement
known as J245 and J1349 and that Puerto Rico's regulations did not
specify which method was to be used until March 1989, when the
regulations were amended to require the use of J1349.
 The undisputed evidence is that Volvo's certifications to
Trebol until March 1989 used J245, which yielded a measurement of
107 hp for 200 series vehicles. After the regulations were
amended, Volvo began using J1349, which produced a measurement of
114 hp and materially increased the excise tax owed on the
vehicles. As far as the record shows, Volvo's certifications
disclosed the method used in calculating horsepower and were
accurate under the methods used.
 Plaintiffs make a similar claim of inaccuracy as to car
weight. Plaintiffs' expert admitted that, prior to 1989, Puerto
Rico had no regulations defining how a car's "curb weight" was to
be calculated. Volvo's certifications specified that certain items
were not included in the weighing, such as fluids, air
conditioning, air bags, and other accessories. The weight
regulations were amended in 1989 to specify that curb weight
included the weight of fuels and lubricants, among other items. 
There is no evidence that Volvo's certifications thereafter failed
to report the higher weights as required under the amended
regulations. 
 Plaintiffs call Volvo's behavior prior to 1989 "excise
tax fraud." Their contention is that Volvo knew of the alternative
measurement methods for weight and horsepower, but used "false"
horsepower and weight figures that enabled Trebol to "evade"
payment of over $20 million dollars in excise taxes. According to
plaintiffs, it is fraudulent behavior to take advantage of
loopholes in the tax laws and a reportedly lax regulatory
environment. Plaintiffs cite no authority for the proposition
that reducing one's tax burden with methods that are not prohibited
by law constitutes tax fraud. We are confident that none can be
found. 
 Plaintiffs attempt to strengthen their argument by
demonstrating that Volvo and Trebol knew that other methods of
calculating horsepower and weight were available. In particular,
they note that the owners' manuals for similar cars sold in the
United States and Canada stated horsepower according to the J1349
method well before 1989. This does not establish that Volvo or
Trebol had a duty to use J1349 figures in compliance with Puerto
Rico's tax laws. Plaintiffs' own expert stated that they did not
have such a duty.
 A separate issue concerns the disclosure of the FOB
price. Plaintiffs proffered several submissions of Trebol Motors
to the tax authorities in which the FOB price reported is
substantially lower than the invoice price charged by Volvo. A
jury could certainly infer that, absent an explanation, such
underreporting--at least if systematic--constituted tax fraud by
Trebol. However, no evidence implicates Volvo in false reporting
of the FOB price to the Puerto Rican Bureau of Excise Taxes. The
plaintiffs' tax expert agreed that the duty to pay the excise tax
applies to the Puerto Rican importer, not to Volvo. Another expert
agreed that he had seen no evidence that Volvo had participated in
tax evasion involving FOB prices.
 Plaintiffs place great weight on a single sentence in a
single piece of correspondence in 1987 by a Volvo representative to
Trebol. The letter concerns a reduction of the length of the
factory warranty for 1988 vehicles in light of Trebol's inability
to keep warranty claims within Volvo's suggested budget. The
letter points out that retaining a three-year warranty would
require Volvo to raise the vehicle price by $500, whereas reducing
the warranty to one year would enable Volvo to reduce the price by
$500. The letter then states: "Also keep in mind that there is a
hidden potential profit for you due to reduced excise taxes."
 The plaintiffs argue that this sentence refers to Volvo's
and Trebol's joint efforts to circumvent excise taxes by
underreporting data to Puerto Rican authorities. Although
creative, this reading is utterly implausible because the letter,
in all other respects, relates to the substantial warranty expenses
incurred by Trebol. The quoted sentence can only refer to the fact
that a reduction in warranty, by reducing the invoice cost of the
car, would by the same token reduce Trebol's excise tax liability,
which was calculated partly as a function of invoice cost.
 Even if plaintiffs' evidence were sufficient, they have
failed to prove that they were injured "by reason of" such
activity. 18 U.S.C. 1964(c). Since excise taxes ordinarily
increase the cost to consumers, plaintiffs presumably benefitted
from a reduction in taxes. They argue that, by paying lower taxes
than competing automobile businesses, Trebol gained an advantage
allowing it to dominate the European car market in Puerto Rico and
charge higher prices than a truly free market would allow. It is
uncertain whether this sequence, even if proved, would involve
injury too remote to support recovery under RICO. See Holmes v.
Securities Investor Protection Corp., 503 U.S. 258, 268-74 (1992).
 However this legal issue might be resolved, plaintiffs
have pointed to no evidence in the record that other car importers
bore higher tax burdens, that these taxes were a reason for a lack
of competition among European cars, or that plaintiffs bought
Volvos because of a lack of European-car alternatives. We
therefore conclude that no rational jury could have found that the
supposed "excise tax fraud" comprised acts by Volvo in violation of
RICO or caused a recoverable injury to plaintiffs.
 Port-Added Emblems and Accessories. Plaintiffs' next
allegation concerns emblems and accessories. During the class
period, 200 series Volvo cars sold in the mainland United States
and Puerto Rico had emblems affixed to them that indicated the car
model. The vehicles at issue in this case all bore emblems that
identified them as 240 DL, 240 GL, or 240 GLE. The middle number
"4" in the 240 model series indicates a car with a four-cylinder
engine. The underlying 240 series car "platform" is the same in
all cases; the evidence at trial showed that the emblems reflect
varying levels of accessories. In any given market in any given
year, GLEs have more accessories and are more expensive than GLs,
which in turn have more accessories and a higher price than DLs.
 The dispute centers on how the emblems and accessories
came to be part of the cars as sold to Puerto Rico customers. 
Between 1985 and 1991, all 200 series cars sent to Puerto Rico
arrived from Sweden as 240 DLs with DL emblems. Trebol, with
Volvo's permission, equipped some DLs with additional Volvo
accessories and new GL or GLE emblems, all of which had been
shipped separately from Sweden. The cars were then sold as either
GLs or GLEs. This contrasts with Volvo's practice in most other
destination markets, where vehicles were imported with accessories
and emblems already factory-installed in Sweden.
 Trebol also marketed a car called a "240 DLWA," which
bore a DL emblem but had certain added accessories not included in
Trebol's 240 DL. DLWA appears to be an internal designation
adopted by Trebol. Although this model type was not reflected on
an emblem, it did appear in Trebol's internal price lists and some
customer purchase contracts. Thus, even within a single model
year, vehicles bearing the same emblem might have different
accessories.
 The plaintiffs claim that Volvo's authorization of port
installed accessories and emblem changes gave rise to "fake" Volvo
models, permitting Trebol to sell cars that were "in reality" DLs
as if they were DLWAs, GLs or GLEs commanding higher prices. 
Several plaintiffs testified that they felt "cheated" when they
discovered that their DLWA, GL or GLE was not "from the factory"
but rather was shipped from Sweden as a DL, with accessories added
in Puerto Rico. Plaintiffs do not dispute that the cars and all
their equipment, including the accessories installed in Puerto
Rico, had been manufactured by Volvo in Sweden.
 At trial, Volvo's representative offered an arguably
plausible business explanation for the practice. However, Volvo
apparently conceded that local installation of major accessories
was a rare practice in Volvo's other markets and did not occur in
the larger continental U.S. market. And doubtless a jury might
initially think that there was something suspicious about upgrading
the emblem after the car left the factory.
 But looked at objectively, the plaintiffs received the
cars they ordered--Swedish-made Volvo 240 series car platforms with
specified accessories--and this is so whether the Swedish voltmeter
and upgraded tires were installed in Sweden or Puerto Rico. The
Puerto Rico customers all knew what accessories their respective
cars contained. The question, then, is whether Trebol's sale of
the car with no affirmative false statement as to where the
accessories were installed could be treated as fraud. At the core
of the issue is how fraud is to be defined.
 Putting aside the scienter element in fraud and looking
only at behavior, the locus classicus of fraud is a seller's
affirmative false statement or a half truth, i.e., a statement that
is literally true but is made misleading by a significant omission. 
See Emery v. American Gen. Fin., Inc., 71 F.3d 1343, 1348 (7th Cir.
1995) (Posner, C.J.). At common law, fraud doctrine did not impose
any broader, general duty to disclose, see Chiarella v. United
States, 445 U.S. 222, 228 (1980), but it is settled that the mail
and wire fraud statutes go somewhat beyond the common law, seeMcEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786,
791 (1st Cir. 1990). Thus, a leading commentary on federal jury
instructions says that even where there is no falsehood or half
truth:
 [T]he failure to disclose information may also
 constitute a fraudulent representation [under
 the mail and wire fraud statutes] if the
 defendant was under a legal, professional or
 contractual duty to make such a disclosure . .
 . .

2 Sand, Siffert, Loughlin & Reiss, Modern Federal Jury
Instructions, 44.01, at 44-11 (1997).
 There is no basis here for imputing to Volvo or Trebol a
"legal, professional or contractual duty" to announce where the
emblem and accessories were installed. And Judge Sand's
formulation clearly (and correctly) implies that, outside of these
categories, there is no general obligation of the seller to tell
the buyer everything negative that the buyer might be interested in
learning about the transaction or item to be purchased. It is safe
to say that few sellers do so--without an explicit regulatory
requirement--and caveat emptor remains the general rule (absent
false statements or half truths).
 No doubt a shadowy area exists in which conduct alone, in
context, can amount to a misrepresentation. Imagine the sale of a
240 DL where the salesman made no formal representations about the
car, although knowing it to have a four-cylinder lawnmower engine
in place of a car engine; or, consider a customer who explicitly
told the salesman that she was buying the car because it had built-
in child safety seats, when the salesman knew that the seats had
been removed from that particular car. If such deceptions were
deliberate, we assume, at least arguendo, that the sales could be
treated as artifices to defraud under the federal statutes.
 But nothing inherent in the process of buying a Volvo car
amounts to an implicit representation that a Volvo-supplied volt
meter or power antenna was necessarily installed by Volvo in
Sweden. Many cars today are commonly made entirely in countries
other than the home of the manufacturer, and various components are
made for, rather than by, the car manufacturer. Nor does it matter
that for some other markets Volvo installed more of the accessories
in its Swedish factories; whether or not the jury accepted Volvo's
explanation for its practice (see note 9 above), nothing obliged
Volvo to operate in the same manner in every market.
 Curiously, there is not much direct precedent on the
question of non-disclosure, and nothing is as helpful as the Sand
formulation. It would be a truly revolutionary change to make a
criminal out of every salesman (assuming use of the mails or
telephone) who did not take the initiative to reveal negative
information about the product and who--a jury might find--harbored
in his heart the hope that the buyer would never ask. Whether or
not this would bring business in the United States to a standstill
might be debated; but it is a change, if it is ever to be made,
that should be undertaken by legislatures and not by courts. Cf.McEvoy Travel, 904 F.2d at 791-91.
 The plaintiffs say that the accessories added in Puerto
Rico disproportionately increased the sale price of the vehicles. 
They claim (for example) that the difference in cost to Trebol
between a 1987 DLWA and a 1987 DL was $155, but the difference in
purchase price to the customer was $3100; in other words, Trebol
marked up the accessories enormously. Plaintiffs also say that the
GLE label itself effectively represented a $2000 increase in price. 
Certain plaintiffs testified that they would not have paid these
surcharges had they known that the added accessories were so minor.
 However, the plaintiffs have not shown that the vehicle
price or the nature of the car's luxuries were unknown to them. No
plaintiffs testified that they believed the GLE and GL were
different from the DL in any way other than accessories and
emblems; generally, plaintiffs signed a "Pre-Delivery Inspection
Report" upon delivery of the vehicles acknowledging the accessories
installed in the car. Plaintiffs' statements in retrospect that
they would rather not have paid their bargained-for price for
accessories they knew they were getting are not proof of fraud.
 Prices. The plaintiffs' third claim is denominated as
one of "price fraud." This claim consumed much of the trial with
expert testimony as to whether Volvo cars sold by dealers in the
mainland United States carried substantially lower prices than
equivalently equipped cars sold by Trebol in Puerto Rico. There
was also documentary evidence tending to show or negate Volvo's
awareness of the retail prices of cars in Puerto Rico. 
 Assuming that Volvo was aware that Trebol's retail prices
exceeded those of comparably equipped Volvo cars on the mainland,
such a price disparity is not itself fraud. An excessive price can
be the result of fraud, the defrauded buyer generally paying a
higher price than he would have paid absent a deception. But there
is nothing in the law of fraud that prevents even a single seller
from charging different markups in different markets so long as
there is no affirmative misrepresentation.
 However, plaintiffs' claim does not rest solely on the
premise that Trebol's prices were higher than mainland prices. 
First, the plaintiffs assert that Volvo and Trebol interfered with
the ability of Volvo dealers in the United States to sell cars at
lower prices in Puerto Rico, and that as a result Trebol was able
to keep charging excessive prices. Second, plaintiffs argued that
Trebol, with Volvo's permission, discouraged buyers from purchasing
vehicles in the continental United States and importing them to
Puerto Rico by refusing to honor the imported vehicle's warranty
for more than one year.
 Putting aside Volvo's own responsibility for Trebol's
pricing, large markups and differential pricing may seem unfair to
consumers and may well have appeared reprehensible to the jury. 
And actions taken by Volvo or Trebol or both to reinforce this
market segmentation and to discourage intra-brand competition by
other mainland-based Volvo dealers may have looked even worse. 
Indeed, some kinds of constraints on intra-brand competition are
vulnerable under the antitrust laws. See Continental T. V., Inc.v. GTE Sylvania Inc., 433 U.S. 36, 58-59 (1977); Packard Motor Car
Co. v. Webster Motor Car Co., 243 F.2d 418, 420 (D.C. Cir.), cert.
denied, 355 U.S. 822 (1957).
 The ability to charge excessive markups and engage in
differential pricing is almost everywhere the symptom of lack of
competition or other market failure (e.g., inadequate information). 
Such behavior flourishes in markets that are small and are
geographically or otherwise isolated. For products like
automobiles, customers tend to shop where they can also get service
and one expects less competition and higher markups in thinner
markets (where costs may also be higher). Whether price
discrimination helps or hurts consumers, and it can do either, VIII
Areeda, Antitrust Law 1616f, at 226 (1989), it is not itself
fraud.
 We have no reason to consider whether the antitrust laws
would reach Volvo's discouragement of Florida dealers from
marketing their cars in Puerto Rico or Volvo's use of warranty
policies to dissuade customers from buying their cars elsewhere and
bringing them to Puerto Rico. Antitrust violations were not
charged in this case, and in any event do not constitute predicate
acts under RICO. 18 U.S.C. 1961(1). This is also not the rare
case where an antitrust violation also involves a sufficient
measure of deception to qualify as fraud (e.g., secret bid-rigging
cases).
 Double Invoicing. The most factually complex claim
against Volvo arises from a double invoicing scheme involving a
Liechtenstein-based corporation named Auto und Motoren
Aktiengesellschaft ("AUM"). Trebol, Volvo, and AUM maintained what
was, according to Volvo, a relationship whereby AUM guaranteed
Trebol's debts to Volvo. Volvo would send Trebol an invoice with
every shipment of vehicles and copy that invoice to AUM to keep it
informed of its potential liability.
 Plaintiffs showed that, between 1986 and 1989, AUM sent
Trebol additional invoices for the same vehicles but with different
purported prices. AUM's invoices sometimes overstated the
vehicles' cost relative to the actual price in the authentic Volvo
invoice by as much as $3000; not all AUM invoices contained
inflated prices and some of the inflated ones involved small
amounts (e.g., $50). In any case, Trebol used these inflated
invoices to obtain higher inventory financing from Puerto Rican
banks and Trebol also calculated its retail prices using the
inflated cost as a starting point. Trebol also remitted the higher
invoice amount to AUM, resulting in the accumulation of a pool of
excess funds in Liechtenstein. Plaintiffs' evidence suggested that
some of these funds were funnelled back to Trebol.
 Since Trebol was sent copies of the original Volvo-
prepared invoices, a rational jury could conclude that Trebol knew
of the actual prices and was defrauding Puerto Rican banks by means
of the double invoicing scheme. If Trebol used the inflated
invoice prices on its tax returns, tax authorities may also have
been defrauded. Far more tenuous is the conclusion that Volvoknowingly participated in the fraud. After reviewing the evidence
presented, we do not believe that any rational jury could conclude
that it was more likely than not that Volvo knowingly participated
in the AUM fraud.
 Plaintiffs say that an inference of such knowledge could
be inferred because Volvo's relationship with AUM was unusual and
not adequately explained. Plaintiffs point out that Volvo
importers in other markets usually did not invoice through a
foreign guarantor. Plaintiffs' expert testified that AUM served no
legitimate business purpose: he said that it seemed to serve simply
as a conduit for Trebol's payments and despite the "guarantor"
label, in early 1993, Volvo executed a "Loan Agreement" whereby
Volvo loaned AUM 2.7 million dollars to cover Trebol's debts--a
transaction that appears exactly contrary to a guarantor's role. 
Volvo later authorized a transaction in which AUM swapped Trebol's
debt to it for equity in Trebol.
 The use of a "guarantor" for Puerto Rico but not for the
continental United States is less mysterious than might otherwise 
be supposed. The evidence showed that, in the continental United
States, Volvo's importer was a wholly owned subsidiary of Volvo and
the use of a guarantor would have been superfluous. In Puerto
Rico, Volvo was entrusting valuable inventory to an importer
controlled by the dealer and in a location where Volvo had no
permanent presence. 
 Why Volvo would have lent money to a guarantor on one
occasion was not as well explained; Volvo's representative
described the transaction as involving no real loan of money but as
an "extended credit term" to give Trebol an extension on its
payments for cars shipped by Volvo. One might have expected Volvo,
in conducting a prudent defense, to have shed more light on its
connections with AUM, assuming that they were wholly innocent. But
the burden was not on Volvo to negate charges of fraud, and the
trial judge mistakenly hindered efforts by Volvo to provide some
explanation or negate the inference.
 In all events, on the evidence of record, it would be
pure speculation for a jury to conclude that Volvo had any
knowledge of the double invoice scheme. Self-interest gave Trebol
reason to participate in such a fraud, but there was little reason
for Volvo to do so absent proof--and proof was absent--that Volvo
got more than its original invoice price. The jury had no basis
for concluding that Volvo received more money from AUM than was
charged in the original invoices.
 Plaintiffs rely on United States v. London, 66 F.3d 1227,
1243 (1st Cir. 1995), in which we held that "evidence of mutual
interest" between a money launderer and his clients supported an
inference that the launderer "intended to promote" his client's
illegal activities. However, the inference in London was
permissible only because "evidence of mutual interest" was coupled
with "know[ledge] that the property involved . . . represent[ed]
the proceeds of some form of unlawful activity." Id. at 1242
(quoting 18 U.S.C. 1956(a)(1)(A)(i)); see also United Statesv. Ortiz, 966 F.2d 707, 713-14 (1st Cir. 1992), cert. denied, 506
U.S. 1063 (1993). Plaintiffs have not shown analogous knowledge on
Volvo's side that Trebol was engaging in fraudulent activity.
 Disclosure Labels. The last of the "five frauds"
involves misrepresentations of information on disclosure labels
required by law. During most of the class period, a Puerto Rican
statute, popularly known as "Law 77," mandated that the "seller or
dealer" of motor vehicles conspicuously affix to each vehicle for
sale a label disclosing, inter alia, the name and address of the
selling entity, the factory cost of the vehicle, the tax "on the
vehicle and equipment installed in Puerto Rico," and the "[r]etail
price in Puerto Rico suggested by the seller." P.R. Laws Ann. tit.
23, 1023 (1987), repealed by 1992 P.R. Laws Act 80.
 Plaintiffs introduced several automobile disclosure
labels showing "cost" figures that were based on the inflated
figures sent by AUM. Because the information actually provided in
Trebol's labels is critical to this claim of fraud, we have
reproduced an example of such a label in the appendix to this
opinion, omitting specific cost numbers. Although Trebol's labels
did not precisely follow the requirements of Law 77, it is clear
that they were intended to be Law 77 labels.
 Trebol appears to have begun with AUM's inflated CIF
("cost, insurance, freight") figure and added more items --
occasionally itemized by Trebol in the margin of AUM invoices as
"royalties," "accessories," "publicity," and "other costs" -- to
produce a base "cost" figure that was reported on the Law 77 label. 
Trebol's Law 77 label then added excise taxes, license plate fees,
compulsory insurance and "other costs" to produce a "total vehicle
cost." The label also stated a "suggested sales price" which was
somewhat higher (e.g., $1,500) than the "total vehicle cost";
actual purchase prices generally fell between the total vehicle
cost figure and the suggested sales price.
 To the extent that the AUM invoices gave inflated CIF
cost figures (and not all did), the Law 77 labels that copied those
figures misrepresented what Law 77 intended to be the factory
"cost" of the vehicles to Trebol. The jury could easily infer that
this misrepresentation injured some of the plaintiffs; in
bargaining with Trebol, customers probably believed that the dealer
had to charge at least the reported "total vehicle cost." 
Deliberately overstating this figure would be fraud, and we need
not look far to find a use of the mails in connection with the
scheme, namely, Trebol's correspondence with AUM which furnished
the inflated CIF figures.
 However, plaintiffs do not dispute that the label
provision of Law 77 imposes the disclosure obligation only upon
sellers or dealers, which are clearly distinguished from
"manufacturers" in the statute. See P.R. Laws Ann. tit. 23, 
1022, 1023. There is no evidence, nor is there a basis to infer,
that Volvo had any role in the preparation or display of the
labels. Indeed, as already explained, there is no evidence that
Volvo ever knew that AUM was furnishing false figures to Trebol,
which Trebol then used in the Law 77 labels.
 Alternatively, plaintiffs argue that Volvo must at least
have been aware that false labels were being affixed. Its 
representatives, they say, visited Trebol for quarterly meetings to
discuss marketing and sales. At least one Volvo witness said he
was familiar with Trebol's prices to customers, although he did not
say that he learned this information from looking at the labels. 
Volvo was also entitled under its importer agreement to direct
reports from Trebol as to prices and sales. 
 We will assume arguendo (and seemingly without any direct
evidence) that Volvo representatives saw the Law 77 labels, that
they read Spanish, and that they took note not only of the
suggested sales price on the labels but the underlying cost figures
as well. As already noted, Law 77 requires a statement of the
"factory cost of the vehicle." If the labels had been phrased in
this way, perhaps they would have been alerted to a discrepancy
between the ordinary factory price of an unequipped DL and the
higher figure on the label derived from the false AUM invoices.
 But the actual labels did not refer to "factory cost" at
all, although Law 77 intended that this figure be furnished;
instead, the base figure stated on the label is identified as
"costo (incluye flete y seguro)," i.e., cost including shipping and
insurance. There is no indication on the label whether the cost
purports to be that of the manufacturer or of the importer--
remember, here the "seller" is third in the chain--or whether it
includes the accessories shipped separately from Sweden, or whether
a potentially significant importer markup is included anywhere in
the cost figure. 
 To infer from this that Volvo knew that Trebol was using
false Law 77 labels is a leap that cannot rationally be made. 
Plaintiffs do not offer any persuasive explanation as to precisely
how the Law 77 labels must have revealed fraud to Volvo. Nor do
provisions of Volvo's standard importer agreement granting Volvo
the right to request reports on Trebol's sales and financial
situation suffice; not only is it unclear what information Volvo
received, but there is no showing that Trebol's sales prices and
balance sheets would have revealed the "cost" misrepresentations on
Law 77 labels.
 Turning from Trebol's disclosure obligations to those of
Volvo, plaintiffs argued Volvo itself was obliged to ensure that
the cars bore a different label, required under the Automobile
Information Disclosure Act (commonly called the "Monroney Act"), 15
U.S.C. 1231-33. This statute requires that every "manufacturer
of new automobiles distributed in commerce" in the United States,
including Puerto Rico, have a label affixed to the windshield or
side window prior to delivery to the dealer, specifying information
akin to, but different in some respects from, the disclosure
required under Law 77.
 The statute defines "manufacturer" as "any person engaged
in the manufacturing or assembling of new automobiles, including
any person importing new automobiles for resale." 15 U.S.C. 
1231(a). Volvo asks us to read the Monroney Act as if the duty to
install the label on imported cars falls on the importer rather
than upon the foreign manufacturer. This suggestion has some
force--merely as a matter of language--because the label
requirement is directed to the affixing of the label "prior to the
delivery of any new automobile to any dealer," id. 1232, which is
the task usually performed by the importer in the case of a foreign
car.
 Volvo's interpretation is also supported by some
legislative history which speaks of disclosure by the manufacturer
"or" importer, see H.R. Rep. No. 85-1958 (1958), reprinted in 1958
U.S.C.C.A.N. 2902, 2903, 2906, and by the fact that certain of the
information required in the label would be known to the importer
but not necessarily to the manufacturer, see, e.g., 15 U.S.C. 
1232(c) (name and address of each dealer). Two trade associations
have filed an amicus brief asserting that the uniform practice in
the case of foreign car imports is for the importer rather than the
manufacturer to affix the label. 
 We were unable to locate any decided case on this issue
and need not resolve it here. As plaintiffs themselves assert,
Volvo was not sued under the Monroney Act, and the Monroney Act is
not one of the statutes whose violation comprises a predicate act
under RICO. 18 U.S.C. 1961(1). Even if the Monroney Act did
apply to Volvo, plaintiffs' fraud claim on this theory would fail
for lack of proof of scienter: as already noted, the offense of
fraud requires both a deceptive act and knowledge that the act is
deceptive. Cassiere, 4 F.3d at 1011. 
 A mail or wire fraud conviction usually cannot result
from a failure to disclose unless the defendant was aware of its
duty to disclose. See, e.g., Cassiere, 4 F.3d at 1022; Sand,
supra, 44.01, at 44-11, 44-16. If Volvo knew it was required to
disclose information under the Monroney Act and failed to do so,
such a deliberate violation could constitute an act of fraud. See,
e.g., United States v. Melvin, 544 F.2d 767, 774 (5th Cir. 1977). 
However, if the disclosure was omitted in good faith, there was no
fraud. United States v. Dockray, 943 F.2d 152, 155 (1st Cir. 1991)
(holding that good faith is an "absolute defense" to mail and wire
fraud); United States v. Ashman, 979 F.2d 469, 480 (7th Cir. 1992)
(same).
 Volvo's duties under the Monroney Act are far from clear,
and plaintiffs offered no evidence that Volvo knew it had a duty to
affix labels to cars sold by Trebol. Volvo's practice on the
mainland was to let its own importing company attach the labels,
there was no showing that foreign manufacturers ordinarily affixed
such labels, and there is no indication that any foreign
manufacturer has ever been held liable for failing to affix a
label. Under these circumstances, an inference of deliberate
deception by Volvo would be impossible to sustain even if we agreed
that Volvo had such a legal duty under the Monroney Act--a point on
which we are at the very least doubtful.
 To conclude, it is only with great reluctance that an
appeals court rejects a jury verdict for lack of evidence to
support it. But save for acquittals in criminal cases, the right
to jury trial under our Constitution does not mean that the jury
automatically gets the last word: a jury decision is final only
where a jury, operating within the framework of the governing legal
rules, could rationally decide the case in the manner it did. And
the error may not be the jury's fault at all.
 In this case, we do not know whether the jury was misled
by jury instructions whose validity we have not had to consider, or
whether it wrongly attributed Trebol's fraud to Volvo or found
offensive the higher markups charged in Puerto Rico, or whether the
explanation lies somewhere else. It is enough here that the
evidence was not sufficient, under a proper reading of the law, to
impose liability on Volvo. Volvo is entitled to judgment as a
matter of law on the merits of the complaint.
 The district court's judgment entered on October 10,
1996, is reversed as to Volvo.
 It is so ordered. APPENDIX

 TREBOL MOTORS
 ***********************

 DECLARACION DE INFORMACION AL CONSUMIDOR
 DE ACUERDO A LOS REQUISITOS DE LA LEY
 NUMERO 77 APROPADA EL 31 DE MAYO DE 1972

1. NOMBRE DEL VENDEDOR DIRECCION DEL LOCAL

______________________________ ____________________________

 DIRECCION POSTAL

_____________________________ ____________________________

2. NOMBRE DEL IMPORTADOR DIRECCION DEL LOCAL

TREBOL MOTORS CORP. PO BOX 11204 FDZ JUNCOS
 SANTURCE, PR 00910

3. FECHA INTRODUCCION MARCA NUMERO DECLARACION
 10/11/87 VOLVO 88041

 MODELO AND NUMERO DE MOTOR
 4DLWA 1988 YV1AX8845J1 285905

4. PRECIO DE VENTA SUGERIDO ***************

5. PRECIO CONTRIBUTIVO ********************

6. COSTO (INCLUYE FLETE Y SEGURO) *********
 IMPUESTOS (ARBITRIOS) ******************
 DERECHOS DE REGISTRO (TABILLAS) ********
 SEGURO COMPULSORIO (ACAA) **************
 OTROS COSTOS ***************************

 TOTAL COSTO VEHICULO *******************

 
 STOCK: 4DLWA3090