# United States Court of Appeals
## For the First Circuit

————————————

No. 00-1039

UNITED STATES,

Appellee,

v.

STEPHEN R. MARTIN,

Defendant, Appellant.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

————————————

Before

Torruella, Chief Judge,

Selya, Circuit Judge,

and Casellas,* District Judge.

————————————

William Gray Schaffer, by appointment of the Court, with whom
Curtis Thaxter Stevens Broder & Micoleau was on brief, for appellant.
F. Mark Terison, Senior Litigation Counsel, with whom Jay P.
McCloskey, United States Attorney, was on brief, for appellee.

————————————

*  Of the District of Puerto Rico, sitting by designation.

September 28, 2000
_____

**TORRUELLA, <u>Chief Judge</u>**.  On September 16, 1998, a grand jury returned a indictment charging Dr. Stephen R. Martin and Caryn L. Camp with ten counts of wire fraud, two counts of mail fraud, one count of conspiracy to steal trade secrets, one count of conspiracy to transport stolen goods, and one count of interstate transportation of stolen goods.  Camp agreed to testify against  Martin as part of a plea agreement.  Martin proceeded to trial, where a jury found him not guilty on six counts of wire fraud (counts 1-6) and of interstate transportation of stolen goods (count 15).  The jury found Martin guilty on the remaining counts of wire fraud (counts 7-10), mail fraud (counts 11-12), conspiracy to steal trade secrets (count 13), and conspiracy to transport stolen property in interstate commerce (count 14).  This appeal, challenging the sufficiency of the evidence for conviction, followed.

For the reasons stated below, we affirm.

## BACKGROUND

This case arises out of an electronic mail "pen-pal" relationship between a dissatisfied Maine chemist, Caryn Camp, and a California scientist, Dr. Stephen Martin.

## I.  Events Prior to May 1, 1998

### A.  Camp's Employment at IDEXX

Camp first began work at IDEXX, Inc. ("IDEXX"), a manufacturer of veterinary products headquartered in Portland, Maine,

in May of 1995. Camp's responsibilities as an IDEXX chemist included mixing chemicals for diagnostic test kits for both pets and livestock. At the time of her employment, she signed non-disclosure and non-competition agreements, promising in part not to "disclose to others, or use for [her] own benefit or the benefit of others, any of the Developments or any confidential, proprietary or secret information owned, possessed or used by [IDEXX] or its customers or contractors." The proprietary information included, but was not limited to, "trade secrets, processes, data, know-how, marketing plans, forecasts, unpublished financial statements, budgets, licenses, prices, costs, and employee, customer and supplier lists." Camp also signed the IDEXX policy on ethics and business conduct, which prohibited employees from revealing "proprietary knowledge or data" without prior authorization.

### B. Martin's Communication with IDEXX

In May 1997, Martin, as CEO of Wyoming DNA Vaccine ("WDV"), contacted IDEXX with a proposal involving research into human immunodeficiency virus (HIV) and feline immunodeficiency virus (FIV). Although IDEXX ultimately rejected Martin's proposal, he signed a confidentiality agreement during his conversations with IDEXX.

### C. Camp's Initial Contact with Martin

By early 1998, Camp was dissatisfied and bored with her job. In January 1998, she began researching other potential job opportunities. She found the Internet web site for WDV and sent an

electronic mail message with an attached resumé. Martin responded immediately via electronic mail, praising Camp's credentials and touting the beauty of Cody, Wyoming (the future site of WDV). Martin also noted the existence of the WDV-IDEXX confidentiality agreement and the fact that WDV had chosen to "develop [its] own program . . . with respect to veterinary diagnostics." After receiving Martin's response, Camp sent Martin a letter providing more detail about her qualifications.

Between January and March of 1998, Martin and Camp continued their correspondence. Based partly on Martin's encouragement and partly on her own interests, Camp contacted the Director of Regulatory Affairs at IDEXX and obtained permission to "volunteer [her] free time" to learn that end of the business. Martin indicated that despite Camp's preference for laboratory work, she would be more useful to WDV for her regulatory experience and knowledge. Martin briefed Camp on his own work at WDV, while Camp continued to update Martin on her professional success, in particular her promotion to a technical position in IDEXX's Livestock/Poultry unit.

Camp and Martin's early correspondence established several themes that would permeate their e-mails: contained within the small talk was on-going discussion of Camp's future employment with Martin's company, as well as a willingness by Camp to relay IDEXX information and gossip to Martin. Camp described her promotion as preparation

"for making a strong contribution to the success of WDV" within four to six months.  Her February 27 letter contained information regarding a manual that "Idexx . . . [is] not exactly supposed to have."  And throughout this period, Camp's correspondence included light-hearted remarks about the weather, life in Maine, and a potential future in Wyoming.

### D.  "Pen-Pals"

Camp and Martin's correspondence became more and more frequent during March and April of 1998.  Camp continued to apprise Martin of her problems with IDEXX management, the changes associated with her new position in technical support, and her interest in new employment, both at WDV and elsewhere.  At times she included information about IDEXX's internal strategic weaknesses and customer complaints.  Camp noted in an April 12 e-mail that the information she had transmitted was to some extent confidential.  Martin reciprocated the information exchange: he told Camp about conflicts within WDV that ultimately resulted in his formation of a separate company called "Maverck"; he also relayed "confidential" WDV information.  Martin continued to discuss Camp's future, noting that she could "have a job with either [WDV or Maverck]," that he thought she "belong[ed] in Tahoe/Reno," and that she might "become CEO [her]self one day."

As the two corresponded more frequently, their communications became more personal.  Camp began to refer to Martin as "Steve."  They

discussed their families and social lives, and even shared the messages with family members. As their relationship grew more personal, both Camp and Martin, but particularly Martin, spoke jokingly of the "spy" aspect of the correspondence. For example, Martin referred to Camp's gossip as "IDEXX Files" and described the events at WDV as a "palace coup." Martin also continued to praise Camp's "aggressiveness" and exhorted her to work only in her own interest and to continue to accumulate relevant knowledge.

On April 14, Martin indicated that he "had much to tell" Camp, but that he wanted her to sign a confidentiality agreement first. Camp considered signing the agreement immediately, but ultimately postponed signing because of potential ethical concerns, including potential competition between WDV and IDEXX.[1]

On April 22, Camp sent Martin an e-mail discussing the poultry and livestock industries, noting problems IDEXX customers had been having with particular diagnostic kits, and mentioning that customers "loved" the IDEXX free software program "x-Chek." Camp continued to discuss IDEXX's poor customer service approach in her May 1 "travelogue," written during a business trip to the Midwest.

---

[1] In an April 19 e-mail message, Camp wrote: "I'm not certain of how comfortable I am with signing the agreement as long as I am working for another company - particularly a company which is or could be a potential competitor, nor I am I [sic] comfortable with you sharing with me anything which you feel needs to be covered by this agreement."

Throughout her "travelogue," Camp repeatedly expressed her happiness in being away from IDEXX and her willingness to move on to new employment.

## II.  Events Between May 1, 1998 and July 18, 1998

The government's first six counts of wire fraud, on which Martin was acquitted, stem from correspondence occurring prior to July 18, 1998.  One count of mail fraud, on which Martin was convicted, also stems from this period.

### A.  Martin's Initial Requests

On May 1, in response to Camp's lengthy e-mail detailing her trip, Martin made his first explicit request for information, asking for "any info. . . . on the HOT topics in veterinary diagnostics." Martin renewed his request in a May 3 e-mail in which he asked a number of questions about IDEXX prices, test composition, and test use.  In a subsequent message, Martin outlined his ability to avoid patent infringement with IDEXX and noted that "IDEXX is going to be in trouble very soon."  On May 3, Camp responded with answers to most of Martin's questions.  Attached was a letter detailing problems with a particular IDEXX product.  In reference to a previous discussion about flying planes, Martin began to refer to Camp as "Ace," a moniker which would become "Agent Ace" as their "spy" business heated up.

### B.  Camp's Responses

On May 4, Camp wrote concerning IDEXX's legal problems.  She also included "lots & lots of goodies for your next rainy day,"

including internal memoranda. Camp noted that the internal memoranda may have been confidential. "I feel like a spy," she commented. In a letter the next day, Camp regretted her actions, promising to "be good . . . and send no more dirty secrets from Idexx. . . ." Martin responded, claiming that he did "not want to know anything confidential about IDEXX," and asking only for "public information."

Despite Camp's repentance and Martin's denial of any desire for confidential or proprietary information, Camp continued to assemble and pass on information, an activity which she apparently viewed as ethically suspect.[2] Camp also relayed information on IDEXX's strategic plans, including a potential partnership with a company whose name, at least, was confidential. By late June, Camp appeared set on leaving IDEXX, as she commented that "I need to unload all of my stock options." Furthermore, Camp had received (and ignored) reminders of her non-compete and non-disclosure agreements; she forwarded these reminders to Martin, noting that "as a spy myself, I get a particular chuckle out of [them]," and that "my loyalty has ended." Camp and

---

[2] Camp's May 7 e-mail noted that "the fun part of my week has been putting together packages of information for you . . ." and celebrated "the intrigue of being Agent Ace." On June 22, she "couldn't resist playing Ace-the-Spy today . . . and so I am dropping a few more things in the mail." But her fun did not come without guilt: "I know I should be shot. But I just can't resist sending you this chain of internal Idexx e-mails regarding concern of a certain competitor;" "I am probably crossing the line with this [but] I've crossed lines worse than this one." However, Camp re-assured herself that she was doing nothing wrong, that she was forwarding "nothing proprietary" but simply the "dirty secrets of an IDEXX Livestock and Poultry weekly meeting."

Martin began to formalize their plans for meeting at Lake Tahoe in early August, as well as for Camp's eventual move to Nevada.[3]

---

[3] The result of the so-called "palace coup" was that Martin left WDV to begin a separate venture (Maverck) prospectively located in Reno, Nevada.

### C. More Questions

As Camp prepared to leave IDEXX, she continued to send Martin information, at times upon his requests and at times on her own initiative. In a July 4 e-mail, Martin inquired about IDEXX's methodology for flourescent-based tests. Camp responded that she was not familiar with the technology, but that she would "try to have some answers by the end of the week." By July 7, she did. In a postscript to a July 10 message, Martin renewed his request regarding particular tests, their procedures, and IDEXX sales practices. Camp responded to the extent she was able.

### D. Potential Competition

Martin also disclosed his "game-plan" to compete with IDEXX. Martin noted that Camp should "think tests for heartworm, FIV, FeLV, etc.," all tests IDEXX currently sold. Camp responded with instructions on how "[t]o beat the competition (for cat & dog diagnostics) . . . [in which] Idexx is definitely the world-wide leader." Martin egged her on: "I always meant to tell you that we could always start our own veterinary lab service company - just like all the fine folks that IDEXX is trying to buy out."

### E. The First Package

On July 12, Camp sent Martin a large package of information via Priority Mail, including various devices, product inserts, USDA course materials, information on her own projects, miscellaneous IDEXX

product information, and "Examples of My Work," labeled "Confidential." Camp also promised to send an actual test kit, if Martin wished. The mailing and receipt of this package formed the basis of a mail fraud charge, of which Martin was ultimately convicted. After receiving the package, Martin once more praised Camp's aggressiveness, encouraged her to "keep on charging," to "keep on thinking about the competition, and how we can beat them," and promised that "lips are sealed."

## III.  Events Between July 19, 1998 to August 16, 1998

Correspondence during the next several weeks provided the basis for Martin's conviction on four counts of wire fraud.

### A.  More Questions and Answers

In several e-mails between July 19 and July 21, Camp outlined a proposal for customer-friendly additions and modifications to current IDEXX technology.  Martin explained how such a test might be constructed, telling Camp that if it could be marketed successfully, she would receive "enough bonus money to buy [a] house for cash." Camp clearly understood that the proposal was for technology competitive with that of IDEXX, as she suggested the possibility that "[she and Martin would] own the whole market."

Camp's proposal also prompted Martin to ask about the relevance and applicability of x-Chek or similar software.  Camp offered to send Martin a copy of the software IDEXX had developed for poultry and livestock testing.  Martin responded the same day, writing

that "he would like to play with the software you mentioned." Camp immediately replied, promising "lots of cool goodies," including the x-Chek disks. Camp also indicated that she was on the verge of "cleaning out her office" and leaving IDEXX; however, she noted that she was speaking to headhunters in addition to Martin.

Martin's response to this last message re-affirmed his intention to compete with IDEXX.[4] Moreover, Martin acknowledged Camp's potentially illicit activity, and exhorted her to continue in her final few days at work. "Before you bag IDEXX (I am embarrassed to ask this), absorb as much information, physically and intellectually, as you can. I never had a spy before." Camp's answer bemoaned the constraints on her information gathering (because co-workers knew she was preparing to leave), detailed her continued efforts to take home both information and property, and admitted the illegality (or at least inappropriateness) of her actions.[5] However, Camp noted that she had as of yet been unwilling to copy "confidential" documents, although she admitted that she had copied "semi-confidential" internal e-mail. The

---

[4] Martin wrote: "We are going to be in the veterinary business big time - vaccines and diagnostics. Dogs, cats, poultry and livestock."

[5] "I have been filling my briefcase every day with all the stuff that I want to keep. . . . Aren't I awful? I'm liking this spy business way too much. . . . The problem [with hiring other IDEXX employees] is they'll see what a thief I am. . . . My biggest "inheritance" from Idexx is a multi-channel pipettor. . . . I am still feeling guilty about [taking the pipets]. I don't know where all this lawlessness in me is coming from."

next day, Camp promised to send Martin additional kits as her last

"secret agent" act.

### B. The Second Package

In Camp's last several days at IDEXX, she continued to collect products and information, which she forwarded to Martin on July 24. The package included operating manuals, IDEXX marketing materials, research and development data, a sales binder prepared by an independent contractor, as well as a binder labeled "Competition."

### C. Found Out

Unfortunately for Camp and Martin, Camp inadvertently sent her July 25 e-mail (acknowledging that July 24 was her last day and detailing the contents of her second package) to John Lawrence, the global marketing manager for Poultry/Livestock at IDEXX. Camp informed Martin of what she had done, and continued on her vacation. According to Camp, Martin later recommended that she lie to IDEXX, i.e., that she tell them that he was interested only in limited information unrelated to IDEXX core businesses. Upon her return to Maine, Camp was intercepted and interviewed by an FBI agent at the Portland airport. An August 9, 1998 search of Martin's home found the contents of Camp's second package, including the x-Chek software.

## DISCUSSION

### I. Standard of Review

An appellant challenging the sufficiency of the evidence presented to a jury faces a difficult task. An appellate court must "examine the evidence in the light most flattering to the prosecution,"

indulge "all reasonable inferences in favor" of the prosecution, and then determine "whether a reasonable jury could find guilt beyond a reasonable doubt." United States v. Echeverri, 982 F.2d 675, 677 (1st Cir. 1993). The court must credit both direct and circumstantial evidence, without evaluating or speculating on the weight the jury has given different pieces of evidence, and without making its own judgments as to credibility. See id. Furthermore, juries need not evaluate pieces of evidence in isolation, but may draw conclusions from the sum of an evidentiary presentation. See United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992). Even if the appellate court feels that a jury could have reached a different verdict, the court need only satisfy itself that the guilty verdict finds support in "a plausible rendition of the record." Id. Note, however, that the jury verdict is not given a "free pass"; if the evidence, when viewed in the light most favorable to the government, "gives equal or nearly equal circumstantial support" to theories of guilt and innocence, the convictions must be reversed. United States v. Andújar, 49 F.3d 16, 20 (1st Cir. 1995).

## II.  Conspiracy to Steal Trade Secrets

The jury found Martin guilty of count 13, which charged him with conspiracy to steal trade secrets in violation of the Economic

Espionage Act of 1996, specifically 18 U.S.C. § 1832(a)(5).[6]  In order to find a defendant guilty of conspiracy, the prosecution must prove (1) that an agreement existed, (2) that it had an unlawful purpose, and (3) that the defendant was a voluntary participant.  See United States v. Echeverri, 982 F.2d 677, 679 (1st Cir. 1993).  The government must prove that the defendant possessed both the "intent to agree and [the] intent to commit the substantive offense."  United States v. Andújar,

---

[6]  18 U.S.C. § 1832(a) provides in full:

> Whoever, with intent to convert a trade secret, that is related to or included in a product that is produced for or placed in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will injure any owner of that trade secret, knowingly-
> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
> (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;
> (3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;
> (4) attempts to commit any offense described in paragraphs (1) through (3); or
> (5) conspires with one or more other persons to commit any offense described in paragraph (1) through (3), and one or more of such persons do any act to effect the object of such conspiracy, shall, except as provided in subsection (b), be fined under this title or imprisoned not more than 10 years, or both.

49 F.3d 16, 20 (1st Cir. 1995) (citing United States v. García, 983 F.2d 1160, 1165 (1st Cir. 1993)).  In addition, the government must prove that at least one conspirator committed an "overt act," that is, took an affirmative step toward achieving the conspiracy's purpose.  See 18 U.S.C. § 1832(a)(5); United States v. Cassiere, 4 F.3d 1006, 1014 (1st Cir. 1993).

The agreement need not be express, however, as long as its existence may be inferred from the "defendants' words and actions and the interdependence of activities and persons involved." Cassiere, 4 F.3d at 1015 (quoting United States v. Boylan, 898 F.2d 230, 241-42 (1st Cir. 1990)).  A so-called "tacit" agreement will suffice.  See United States v. Woodward, 149 F.3d 46, 67 (1st Cir. 1998).  Moreover, the conspirators need not succeed in completing the underlying act, see United States v. Giry, 818 F.2d 120, 126 (1st Cir. 1987), nor need that underlying act even be factually possible.  See id.

As of yet, only the Third Circuit has had the opportunity to address § 1832(a), which specifically covers private corporate espionage.  See United States v. Hsu, 155 F.3d 189 (3d Cir. 1998).  The statute criminalizes the knowing theft of trade secrets, as well as attempts or conspiracies to steal trade secrets.  The Act defines a "trade secret" broadly, to include both tangible property and intangible information, as long as the owner "has taken reasonable measures to keep such information secret" and the information "derives

independent economic value . . . from not being generally known to . . . the public." Id. at 196; 18 U.S.C. § 1839(3).[7] This definition of trade secret "protects a wider variety" of information than most civil laws; however, "it is clear that Congress did not intend . . . to prohibit lawful competition such as the use of general skills or parallel development of a similar product," Hsu, 155 F.3d at 196-97, although it did mean to punish "the disgruntled former employee who walks out of his former company with a computer diskette full of engineering schematics," id. at 201 (citing H.R. Rep. No. 104-788, at 7). In other words, § 1832(a) was not designed to punish competition, even when such competition relies on the know-how of former employees of a direct competitor. It was, however, designed to prevent those employees (and their future employers) from taking advantage of confidential information gained, discovered, copied, or taken while employed elsewhere.

Martin contends that the evidence is factually insufficient to establish a "meeting of the minds" or agreement to violate § 1832(a), because (1) insufficient evidence exists to establish an

---

[7] 18 U.S.C. § 1839 defines the term "trade secret" to include "all forms and types of financial, business, scientific, technical, economic or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, or codes, whether tangible or intangible, and whether or how stored, compiled or memorialized physically, electronically, graphically, photographically, or in writing," as long as the "reasonable measures" and "independent economic value" tests are met (emphasis added).

-19-

agreement between Martin and Camp; (2) insufficient evidence exists to prove that Martin had the necessary intent to commit an act prohibited by § 1832(a), i.e., injure the owner of the trade secret (IDEXX); and (3) the information provided by Camp to Martin did not meet the statutory definition of a trade secret under § 1839(3). As we explain below, none of these arguments are persuasive.

First, the evidence is sufficient for a reasonable jury to conclude that Martin and Camp formed an agreement regarding the theft of trade secrets. Martin's argument against the existence of an agreement relies on the facts that (a) his early e-mails specifically requested that Camp <u>not</u> send him confidential information, and (b) Camp did not seem to know the distinction between confidential information, proprietary information, and office gossip. However, while Martin's disclaimer and Camp's confusion indicate the lack of an explicit agreement <u>at that time</u>, they do not necessarily negate the existence of <u>an</u> agreement. <u>See</u> <u>Woodward</u>, 149 F.3d at 67 (including tacit agreements within conspiracy requirements). A rational jury could have plausibly concluded on the basis of the evidence presented at trial that an agreement existed. By July 21, Martin had received extensive correspondence from Camp that she had either marked "confidential" or "proprietary," or had expressed some hesitation in forwarding.[8] Despite

---

[8] Some of the information Martin received in their early correspondence clearly had the potential to fall within the § 1839 definition of trade secret: for example, cost information unavailable to the public

his previous protestations that he wanted nothing to do with IDEXX or its confidential information, Martin asked Camp on July 21 to "absorb as much information, physically and intellectually, as you can," and included a set of questions to direct Camp's research. Throughout June and July, Martin referred to Camp as "Agent Ace," or as his "spy." Given the type of information that Martin had already received, a reasonable jury could have concluded that, whatever Martin's original intentions, as of July 21, Camp and Martin had reached a tacit agreement by which she would send him items and information that potentially fell under the trade secret definition of 18 U.S.C. § 1839(3). In other words, sufficient evidence exists to show an agreement between Camp and Martin to violate § 1832(a).

Second, the evidence is sufficient to show that Martin intended to injure IDEXX by obtaining IDEXX trade secrets and competing against IDEXX. Although Martin consistently claimed that he had no interest in developing products that competed with IDEXX, and hence had no intention of injuring IDEXX economically, his correspondence with Camp detailed a plan of competition. Martin had, among other things, considered the possibility of starting a competing veterinary lab,[9] and

included in Camp's message of May 2, a confidential IDEXX business plan included in Camp's June 8 message, and a customer list included in Camp's July 1 message.

[9] In his July 19 message, Martin told Camp that he had "always meant to tell [her] that [they] could always start our own veterinary lab service company - just like all those fine folks that IDEXX is trying

-21-

had asked Camp to think, in particular, about ways to compete with tests that IDEXX manufactured. A reasonable jury could have found that Martin intended to use the information gained from Camp, particularly information on IDEXX's costs and customer dissatisfaction with IDEXX, to create a more successful competitor with greater capability to injure IDEXX.

Third, Martin's final argument - that he actually received no trade secrets - even if true, is irrelevant. Martin has only been found guilty of a conspiracy to steal trade secrets, rather than the underlying offense.[10] See Giry, 818 F.2d at 126. The relevant question to determine whether a conspiracy existed was whether Martin intended to violate the statute. See id; see also Hsu, 155 F.3d at 198 ("[T]he crimes charged - attempt and conspiracy - do not require proof of the existence of an actual trade secret, but, rather, proof only of one's attempt or conspiracy with intent to steal a trade secret."). The key question is whether Martin intended to steal trade secrets. A rational jury, considering the information Camp had already sent Martin, could have concluded that his further queries indicated such an intention.

to buy out." A previous message from Camp to Martin had detailed IDEXX's strategy of purchasing competitors.

[10] Similarly, it is not problematic that the jury found Martin not guilty on the underlying offense of interstate transportation of stolen goods, but did find him guilty of the conspiracy to commit such a crime. See United States v. Giry, 818 F.2d 120, 126 (1st Cir. 1987).

A reasonable jury could therefore have concluded that Martin and Camp formed an agreement by which Camp conveyed information and property to Martin that potentially fell under the definition of a trade secret in 18 U.S.C. § 1839. As a result, sufficient evidence existed to convict Martin of conspiracy to steal trade secrets.

### III. Conspiracy to Transport Stolen Property in Interstate Commerce

The jury also found Martin guilty of conspiracy to transport stolen goods interstate, in violation of 18 U.S.C. § 2314[11] and 18 U.S.C. § 371,[12] as charged in count 14. Again, a conviction for conspiracy does not require that the defendant was successful in the underlying offense, see Giry, 818 F.2d at 126, but only that an agreement to commit the underlying offense existed, see Echeverri, 982 F.2d at 679, and that at least one co-conspirator committed an overt act in furtherance of the conspiracy, see United States v. Cassiere, 4 F.3d 1006, 1014 (1st Cir. 1993). To be found guilty of a conspiracy to transport stolen goods interstate, Martin must have agreed to transport "goods, wares, [or] merchandise," with a "value of $5,000 or more," in interstate or foreign commerce, and "known the same to have been stolen, converted or taken by fraud." Dowling v. United States, 473 U.S. 207, 214 (1985) (citing 18 U.S.C. § 2314). Although intangible, "purely intellectual" property does not fall within the auspices of § 2314, intangible components of tangible items may contribute to the

---

[11] In relevant part, 18 U.S.C. § 2314 provides that:

> Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud. . . . shall be fined under this title or imprisoned not more than ten years, or both.

[12] 18 U.S.C. § 371 punishes conspiracies "to commit any offense against the United States."

$5,000 value requirement.  See United States v. Brown, 925 F.2d 1301, 1307-08 & n.14 (10th Cir. 1991).

The indictment for conspiracy to transport stolen goods was based in part on Martin's July 21 request for a copy of x-Chek software and his July 22 acknowledgment that Camp would be sending him additional test kits.  See Brief for Appellant 31 (admitting that the "evidence at trial established . . . two instances on which Dr. Martin requested 'property,' as opposed to 'information.'").  Martin received a large package from Camp in the mail after sending these two e-mails.  However, Martin claims that (1) this evidence is insufficient to establish the existence of an agreement with Camp to transport stolen property; and (2) that the property in question did not meet the $5,000 value requirement of 18 U.S.C. § 2314.

Martin first challenges the sufficiency of the evidence to support the existence of an agreement between Camp and himself with respect to stolen property.  For the same reasons that a rational jury could plausibly have found an agreement to steal trade secrets, we conclude that the same rational jury could have found an agreement between Camp and Martin by which she would send him property from IDEXX.  However, the question remains whether that agreement (1) covered "stolen" property in violation of § 2314, and (2) covered property with a value of more than $5,000.

-25-

For property to be "stolen" under 18 U.S.C. § 2314, the defendant must have "known" it to be "stolen, converted or taken by fraud." Although the prosecution introduced testimony that IDEXX only provided x-Chek for "free" under a license agreement with its customers, Martin claimed that, based on Camp's previous e-mail communication, he believed the software was free.[13] However, in a conviction challenged for sufficiency of the evidence, we must give the jury's finding great weight, asking only whether a "reasonable" or "rational" jury could have "plausibly" found guilt beyond a reasonable doubt. See Echeverri, 982 F.2d at 677; United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992). In this case, given that three months had passed since Camp had described x-Chek as "free," that she had originally discussed it in connection with customer satisfaction, that the "free" label occurred at the end of a lengthy e-mail, and that Martin was a scientist who had surely dealt with companies such as IDEXX before, a jury could certainly have concluded that he knew that such companies did not provide major software packages for free to those who were neither customers nor potential customers, and that Martin knew the software had been stolen or converted from IDEXX.

---

[13] In an April 22, 1998 e-mail, Camp had provided "a few comments on the poultry and livestock industries," concluding that "[t]he main selling point for IDEXX is the free software program (x-Chek) for data analysis and monitoring of vaccination programs - customers love it."

Moreover, with respect to the "free" test kits, the evidence is much stronger that Martin knew that they had been "stolen, converted or taken by fraud." First, when Camp sent Martin the original set of kits, she told him not to "say where [he] got them," and not to mention them to her relatives, because "all rules are null-and-void now that Idexx has been acquiring kits from its competitors by sneaky means." Even though Camp noted that it was part of her job to send free kits to potential customers, Martin was clearly not a potential customer, and could not plausibly have believed that this mandate applied to his "spy" sending free kits to him.[14] Furthermore, Martin admitted that, in the future, he would have to buy the kits, suggesting that he did not really believe he was entitled to obtain them for free.

Finally, the jury could have plausibly concluded that Martin's July 21 request to Camp to "absorb as much information, physically and intellectually, as you can," included a request to send him physical goods such as test kits and software. Martin had already received items from Camp, and was at the time expecting further items, such as the x-Chek software. Although Martin is correct that § 2314 does not apply to purely "intangible information," the theft of which is punishable under copyright law and other intellectual property

---

[14] Furthermore, Camp appended a facetious "smiley face" to her e-mail mention of her duty to send customers free kits, indicating that whatever her job description was, it did not include sending Martin free kits.

-27-

statutes, see United States v. Brown, 925 F.2d 1301, 1307 (10th Cir. 1991), § 2314 does apply when there has been "some tangible item taken, however insignificant or valueless it may be, absent the intangible component," id. at 1308 n.14. Given that at this time Camp had already sent Martin numerous tangible items, he would have been on notice that any request to "absorb information" might (and likely would) produce tangible material that he would receive.

As for Martin's claim that the value of his requests did not meet the $5,000 floor, there is evidence that the value of the x-Chek software approached $2,500, and that individual diagnostic kits ranged from $1,500 to $2,200. Furthermore, there is evidence that Martin was aware of the potential cost of test kits.[15] Whether the actual items received exceeded the statutory value or not (and there is strong evidence that they in fact did), a jury could plausibly have concluded that Martin, with sufficient knowledge of the kit price, had requested items that would likely have exceeded $5,000 and thus satisfied the value prong of the conspiracy charge.[16]

## IV.  Wire Fraud and Mail Fraud

_____

[15] Martin had asked Camp about IDEXX pricing on May 3, 1998, and she responded later the same day with the $1,500-$2,200 range.

[16] In fact, a jury could have concluded that Martin over-estimated the price of diagnostic kits: although Camp provided price information in the $1,500-$2,200 range, the actual price of some of the kits received by Martin ranged from $65 to $250. Martin could therefore have intended to steal $10,000 worth of property, but have only been successful in stealing $5,000 worth.

-28-

The remainder of defendant's convictions are based on four counts of wire fraud and two counts of mail fraud pursuant to 18 U.S.C. §§ 2 (aiding and abetting), 1341 (mail fraud), 1343 (wire fraud), and 1346 (honest services fraud).[17]  Because of the similarity of the operative language of the wire fraud and mail fraud statutes, we analyze the offenses together.  See Carpenter v. United States, 484 U.S. 19, 25 n.6 (1987); United States v. Boots, 80 F.3d 580, 586 n.11 (1st Cir. 1996).  To prove wire or mail fraud, the government must show: (1) a scheme to defraud by means of false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the use of interstate wire or mail communications in furtherance of the scheme.  See Cassiere, 4 F.3d at 1011 (citing United States v. Serrano, 870 F.2d 1, 6 (1st Cir. 1989))

---

[17]   The relevant language of 18 U.S.C. §§ 1341 and 1343 is the same:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . [uses the mails or wires, or causes their use] for the purpose of executing such scheme or artifice . . . shall be punished.

18 U.S.C. § 1346 defines a "scheme or artifice to defraud" in the wire and mail fraud statutes to include "a scheme or artifice to deprive another of the intangible right of honest services."

18 U.S.C. § 2 extends liability to a defendant who "aids, abets, counsels, commands, induces or procures [the] commission [of an offense,]" and to those who "willfully cause an act to be done" which would be an offense if performed by the defendant.

(elements of wire fraud); United States v. Montminy, 936 F.2d 626, 627 (1st Cir. 1991) (elements of mail fraud).

Although the mail and wire fraud statutes originally required that the scheme to defraud aim to deprive the victim of property or some other item of economic value, see United States v. Sawyer, 85 F.3d 713, 723 (1st Cir. 1996), congressional legislation aimed at overruling McNally v. United States, 483 U.S. 350 (1987), expanded the definition to include "schemes intended to deprive another of the intangible right to honest services." Id. Despite concerns about the overreaching of the wire and mail fraud statutes into the employer-employee relationship, see, e.g., United States v. Lemire, 720 F.2d 1327, 1336 (D.C. Cir. 1983), courts have upheld convictions based on employee misconduct, see, e.g., United States v. Frost, 125 F.3d 346 (6th Cir. 1997). As a result of this expanded definition, in order to uphold Martin's conviction, sufficient evidence must exist to show his participation in either (1) a scheme to defraud IDEXX of property or other items of economic value by false pretenses, or (2) a scheme to defraud IDEXX of Camp's honest services by false pretenses. Note that Martin's success in the scheme is not relevant. See, e.g., Serrano, 870 F.2d at 6. We conclude that a rational jury could have found that such evidence had been proven under either theory.

A.  **Property Theory**

Confidential information may be considered property for the purposes of §§ 1341 and 1343.  See United States v. Czubinski, 106 F.3d 1069, 1074 (1st Cir. 1997).  Where such information is obtained - thus depriving the rightful owner of its property rights - through dishonest or deceitful means, the wire and mail fraud statutes may be violated.  See id.  However, mere access to the confidential information is insufficient; rather, "either some articulable harm must befall the holder of the information as a result of the defendant's activities, or some gainful use must be intended by the person accessing the information, whether or not this use is profitable in the economic sense."  Id.  In other words, for Martin's convictions to stand under this prong of the wire and mail fraud statutes, sufficient evidence must exist for a reasonable jury to find that Martin knowingly and willingly participated in a scheme to defraud IDEXX of confidential information or other property via false pretenses, and in so doing either harmed IDEXX or intended to use the information for his own gain.

Martin claims that because, on their face, the e-mails on which counts 7-10 are based contained no misrepresentations, they cannot provide the basis for a scheme to defraud.[18]  However, the e-

---

[18] We will ignore the government's somewhat fanciful suggestions that (1) Martin's delivery of confidential information about his own company and (2) Martin's promises of future employment were themselves misrepresentations.  There is no evidence that Martin - for all his ethical failings here - was insincere in his employment offer to Camp,

mails themselves need not be fraudulent; rather, it is the scheme itself that must rely on false pretenses.  See United States v. Green, 786 F.2d 247, 249 (7th Cir. 1986) ("The causal connection between the mailing and the success of the scheme, not the knavery in the mailings, is what matters.").

A reasonable jury could first have found that, as of July 12 (the date after which the four wire fraud and two mail fraud convictions stem), Camp had agreed with Martin to send him confidential information and tangible property.  Camp had previously noted that her e-mails contained information that she should not have spread; Martin's repeated questions designed to elicit further information, including his acceptance of Camp as his "spy," provide further evidence of the scheme.  A reasonable jury could have found that Martin intended to use such confidential information either to compete with IDEXX, thus harming IDEXX, or at the very least for his own pecuniary gain.  For example, Martin and Camp engaged in a lengthy discussion of the best manner in which to design a test kit that would surpass IDEXX's in serving demanding customers in the veterinary profession.  A reasonable jury could have found that Martin's requests, including to "absorb as much information, physically and intellectually as possible," indicate

nor that his passing of confidential information to her was anything more than a calculated risk to get her excited about his projects. Camp's consistent misrepresentations to IDEXX are, however, sufficient to support the charges of the indictment under examination here.

-32-

that his participation in the scheme was both willing and knowing. Finally, a reasonable jury could have found that Camp's actions - including requesting information beyond her job description without informing IDEXX of her conflicted interests, sending Martin information and property under the pretense that he was a customer who had a right to receive information and property free, and relaying confidential information in violation of both her fiduciary duty to IDEXX and her signed non-disclosure and non-compete agreements - constituted false pretenses.[19]

## B. Honest Services Theory

Alternatively, the jury could have found that Martin and Camp's e-mail communications and mail deposits constituted a scheme to deprive IDEXX of Camp's honest services. Although the honest services doctrine has mainly been used to punish fraud against the citizenry perpetrated by government officials,[20] see, e.g., Czubinski at 1076-77, courts both before McNally v. United States, 483 U.S. 350 (1987), and

_____

[19] The fact that Camp engaged in the false pretense, rather than Martin himself, is irrelevant as long as Martin knowingly and willfully participated in the scheme to take advantage of the false pretenses. See Cassiere, 4 F.3d at 1011. As discussed above, a rational jury could have found that Martin's knowledge of the scheme, reference to Camp as his "spy," and repeated requests for information were sufficient to support a finding that he willingly and knowingly participated in the scheme.

[20] This was the case both before McNally overruled the honest services doctrine, see McNally v. United States, 483 U.S. 350, 359-60 (1987), and after Congress re-instated the doctrine by passing 18 U.S.C. § 1346, see Czubinski, 106 F.3d at 1076 n.9.

-33-

after the passage of § 1346 have been willing to expand the doctrine to the employer-employee relationship, see id. at 1077; United States v. Sun Diamond Growers of California, 138 F.3d 961, 973 (D.C. Cir. 1998) (§ 1346 "has also been used, as here, to prosecute private citizens who defraud private entities").  However, courts have been hesitant to impose federal mail and wire fraud liability upon every employee transgression, and have required "a failure to disclose something which in the knowledge or contemplation of the employee poses an independent business risk to the employer," or creates "reasonably foreseeable economic harm" to the employer.  Sun Diamond, 138 F.3d at 973  (quoting United States v. Lemire, 720 F.2d 1327, 1337 (D.C. Cir. 1983)).[21]  While this Court has held that merely examining confidential information for one's own purposes does not rise to this level, see Czubinski at 1077, use of confidential information for "private purposes" may rise to the necessary level of self-dealing.  See id.[22]

---

[21] Although the First Circuit has not yet considered a case in which the honest services fraud doctrine is applied to the defrauding of a private entity, in Czubinski the court suggested that the Lemire standard was the appropriate one.  See Czubinski, 106 F.3d at 1077 (concluding that "there must be a breach of a fiduciary duty to an employer that involves self-dealing of an order significantly more serious than the [viewing of confidential information at issue in Czubinski]") (citing Lemire, 720 F.2d at 1332-34).

[22] Other courts have found honest services fraud by an employee for pecuniary-related breaches of fiduciary duty.  See, e.g., Lemire, 720 F.2d at 1332-34 (employee took bribes); United States v. Siegel, 717 F.2d 9, 14 (2d Cir. 1983) (corporate fund use for non-corporate purposes).  However, the fraud in question need not deprive the employer specifically of money, but may do so indirectly by showing

A jury could reasonably have found that Camp's disclosure of confidential information was in knowing breach of her fiduciary duty to IDEXX.[23] Moreover, the evidence supports a finding that Camp's failure to disclose her communication with Martin posed "an independent business risk" to IDEXX and created "reasonably foreseen economic harm" to IDEXX. By July 1998, Camp knew that Martin intended his company to compete with IDEXX - in fact, she was authoring proposals detailing how that competition would be most successful.

Under 18 U.S.C. § 2, Martin is guilty of aiding and abetting a crime if he "willfully participated in it," that is, wished it to occur and affirmatively participated in its successful outcome. See United States v. Indelicato, 611 F.2d 376, 385 (1st Cir. 1979). The government has offered substantial evidence of Martin's willing participation in (in fact, sponsorship of) Camp's breach of fiduciary duty. A jury could have found that Martin's request for information about IDEXX's competitive stance, his willing receipt of IDEXX

---

actual harm to tangible interests. See United States v. Frost, 125 F.3d at 367-68 (failure to disclose and reasonable contemplation of business harm sufficient); United States v. Garfinkel, 29 F.3d 1253, 1258 (8th Cir. 1994) (deprivation of benefits of pharmaceutical research).

[23] Camp had signed non-disclosure and non-compete agreements at the beginning of her IDEXX tenure, and had been reminded of the consequences of that agreement midway through her communication with Martin, see Joint Appendix 141 (Electronic mail message from Caryn Camp to Stephen Martin, forwarding internal IDEXX memorandum dated June 4, 1998).

materials and inventory, and his request that Camp gather as much information as possible prior to leaving the company both encouraged and aided Camp in breaching her fiduciary duty to IDEXX. Moreover, in Martin's use of "spy" terminology, in his specific requests for information, and in his apparent willingness to use the information to compete directly with IDEXX, a reasonable jury could have found that his participation in the scheme to defraud IDEXX of Camp's honest services, i.e., to have Camp breach her fiduciary duties for personal gain and harm to IDEXX, was sufficient to maintain liability for aiding and abetting pursuant to 18 U.S.C. § 2.

### C. The Individual Counts of Wire and Mail Fraud

The individual counts of wire and mail fraud then only need be communications designed to effect a scheme under either the property theory or the honest services theory. Again, the communications need not be fraudulent on their face. See United States v. Green, 786 F.2d 247, 249 (7th Cir. 1986) (citing United States v. Sampson, 371 U.S. 75 (1962)). We examine each count in turn to determine if a rational jury might have plausibly concluded that they were used to effect one of the two possible schemes to defraud.

Martin claims that the e-mails on which counts 7 and 8 are based (Camp's offer to send him x-Chek software and his affirmative response) cannot be communications designed to effect a scheme to defraud because he had no knowledge that the software was not free. As

previously pointed out, the record belies this claim. In any event, Camp certainly knew that she was only supposed to send x-Chek to customers; Martin was clearly not a customer. Thus her x-Chek offer could be construed as part of a scheme to defraud IDEXX of her honest services. In other words, a reasonable jury could conclude that Camp's offer to send x-Chek to Martin breached her fiduciary duty to IDEXX and caused IDEXX harm. As a reasonable jury could also find that Martin aided and abetted this breach, see supra, the evidence is sufficient to convict on counts 7 and 8. Furthermore, a jury could reasonably have found that Martin knew that he was not entitled to a free copy of x-Chek. If so, Martin would have obtained the software through false pretenses, and thus satisfied the alternative prong of the wire fraud test with his affirmative response.

Martin admits that his e-mail on which count 9 is based, asking Camp to "absorb as much physically and intellectually as you can," could be construed as "requesting . . . non-confidential public information," Appellant Brief 38, but only if read in isolation. Martin argues that as a non-competitor, he had no use for confidential information, and that the words "as you can" incorporated previous guidelines of confidentiality. Id. at 39. However, it is not our task to determine if alternate interpretations of the evidence were available to the jury, but rather if the evidence was sufficient for the jury to reach a reasonable interpretation upon which it could

convict. See, e.g., United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir. 1991). Certainly the request made by Martin in this particular e-mail is highly suggestive of a request for information which he knew was confidential and would require Camp's "spying" to unearth. A reasonable jury could have interpreted his request in this manner, and thus found that this communication was made in furtherance of the scheme to defraud.

Martin claims that because Camp's July 21 e-mail (on which count 10 is based) denies any use of confidential information, that it could not be part of the scheme to defraud. However, this e-mail alerted Martin to the delivery of seven binders (which included information marked specifically as "confidential"), provided further information about IDEXX procedures and methods, and noted that Camp had "found a jackpot." Despite Camp's denial, we have found above that sufficient evidence existed for the jury to find that a scheme to defraud existed and that Martin received confidential information in connection with this scheme. Given that evidence, this communication - among other things, notifying Martin that she had sent documents to him - clearly furthered the scheme.

With respect to the mail fraud counts (11 and 12), Martin claims that, because Camp mailed items to Martin on her own initiative, Martin could not be guilty of aiding and abetting mail fraud on these counts. Again, defense counsel confuses what Martin is guilty of

-38-

aiding and abetting - the scheme to defraud, not the individual mailing. Again, the jury had sufficient evidence to find Martin guilty of aiding and abetting the scheme to defraud, either through deprivation of property under false pretenses or via honest services fraud. Camp's mailing of the packages to Martin was in furtherance of the scheme: either because it finalized the property removal from IDEXX or provided the final pieces to Martin's future competition with IDEXX. Thus sufficient evidence existed to convict Martin on either count. Moreover, § 1341 itself criminalizes the act of "causing" another to deposit items in the mails that further a scheme to defraud. Especially with respect to the second mail fraud count, based on the package that included the IDEXX software, a reasonable jury could have found that Martin's request caused Camp to send him those materials, and found him guilty of violating § 1341 without relying on aiding and abetting liability.

## CONCLUSION

A careful reading of the seven-month e-mail communication between Dr. Stephen Martin and Caryn Camp could lead to the conclusion Martin and his counsel urge - that this is simply a pen-pal relationship between a lonely Maine lab technician and a reclusive California scientist. However, the evidence could also lead a reader to the conclusion that something far more sinister was afoot: that an originally harmless communication mushroomed into a conspiracy to steal

-39-

trade secrets and transport stolen property interstate, and that the electronic mail and U.S. mails were used to further a scheme to defraud IDEXX.  Because we find there was sufficient evidence for a reasonable jury to conclude the latter beyond any reasonable doubt, we **AFFIRM** the defendant's conviction on all counts.